Julie BAILEY, individually, and as personal representative for the Estate of Brandon Magnuson, Petitioner

v.

LINCOLN GENERAL INSURANCE COMPANY, a Pennsylvania insurance company, Respondent.

No. 09SC527.

Supreme Court of Colorado,
En Banc.

May 16, 2011.

The Overton Law Firm, Thomas J. Overton, Richard J. Gleason, Denver, Colorado, King & Greisen, LLC, Paula Greisen, Laura E. Schwartz, Denver, Colorado, Attorneys for Petitioner.

Hall & Evans, L.L.C., Malcolm S. Mead, George Koons III, Peter F. Jones, Denver, Colorado, Attorneys for Respondent.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

In this insurance coverage dispute, we review the court of appeals' decision in *Lincoln General Insurance Co. v. Bailey*, 224 P.3d 336 (Colo.App.2009), which upheld enforcement of a criminal-acts exclusion in an excess-insurance policy that absolved the insurer, Lincoln General Insurance Company ("Lincoln General"), from coverage for damages resulting from criminal acts committed by Raymond Juhl (the "insured"), Lincoln General's insured.

The insured, driving a rental car under the influence of methamphetamines, led police on a high-speed car chase that ended when, speeding on the wrong side of the road, he struck a vehicle containing Julie Bailey and her son, Brandon Magnusson. Ms. Bailey was critically injured and her son was killed; Ms. Bailey and her son's estate are the plaintiffs in this case. The insured pled guilty to five felonies, including second degree murder.

The insured assigned his rights to the plaintiffs to collect on a $1 million excess-insurance policy issued by Lincoln General when he rented his car. Lincoln General denied coverage for damages caused by the insured, relying on, in part, an exclusion in the rental agreement that voided coverage if the car was used to commit a crime that could be charged as a felony. The trial court, and the court of appeals, held that this criminal-acts exclusion was enforceable.

We consider two issues regarding this criminal-acts exclusion.[1] The first is whether

---

1. We granted certiorari on the following issues:
 1. Whether the court of appeals was correct in concluding that the crime exclusion to supplemental liability insurance in the rental car agreement was not unconsciona- ble and did not violate the doctrine of reasonable expectations.
 2. Whether the lower courts erred in finding that the SLI exclusions are not contrary to public policy because the policy of fair

it violates public policy. We conclude that, although the public policy of Colorado aims to protect innocent tort victims, it also gives insurers the freedom to contract and provide coverage for damages caused by fortuitous events instead of for damages caused by intentionally criminal acts.

■ The second issue is whether insertion of the criminal-acts exclusion into the rental agreement violated the reasonable expectations of the insured. In Colorado, there are two general circumstances where the doctrine of reasonable expectations renders exclusionary language unenforceable: (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue; and (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable insured would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain he or she is not. We conclude that the facts of this case implicate neither circumstance and hold that the criminal-acts exclusion does not violate the reasonable expectations of the insured.

## II. Background

On one afternoon in December 2003, the insured, under the influence of methamphetamines, led police on a high-speed car chase while driving a rental car. At times, police in six different cars attempted to end the chase, which lasted approximately twelve minutes and covered a distance of twenty miles. During this chase, the driver: (1) drove at speeds two to three times greater than posted speed limits, accelerating to speeds over 100 miles per hour; (2) repeatedly veered onto the wrong side of the road; (3) ran multiple stop signs; (4) forced cars, busses, trucks, and police cars to take evasive action to avoid collisions; and (5) avoided police-placed stop sticks by speeding through a hotel parking lot.

The chase ended when the driver, speeding on the wrong side of the road, crashed head-on into an automobile with two individuals inside: the driver, Ms. Bailey, and her passenger and fourteen-year-old son, Brandon Magnusson. Both sustained serious injuries. At one point, Ms. Bailey was in critical condition, but survived. Her son, however, died shortly after the collision.

The insured pled guilty to five felonies related to his use of the car, including second degree murder, first degree assault, vehicular homicide, vehicular assault, and unlawful possession with intent to distribute a controlled substance. He was sentenced to forty-three years in the Colorado Department of Corrections.

Approximately two weeks before the high-speed car chase, the insured obtained the rental car from a Dollar Rent–A–Car ("Dollar") counter at Denver International Airport. As part of a rental car transaction that lasted no more than five to six minutes, the driver purchased a $1 million supplemental liability insurance ("SLI") policy from Lincoln General. This SLI protection covered bodily injury and property damage in accidents involving the rental car, but only as excess insurance; the SLI coverage was only effective after "the limit of liability or limit of insurance of all underlying insurance' available to the insured" was exhausted. The "underlying insurance" in this case was provided by Dollar to the driver as part of his rental agreement, and constituted primary insurance that provided coverage up to the statutorily mandated minimum coverage amounts: $25,000 for bodily injury to any one person, and $50,000 to all persons in any one accident, including property damage. § 10–4–620, C.R.S. (2010).

The insured purchased the SLI coverage from a Dollar rental clerk, who had not received any formal training to sell insurance products. The clerk told the insured that the SLI protection "covered the car bumper to bumper; if he was to get into a wreck, the car was covered." But the clerk never reviewed the terms of insurance with him and did not tell him about any coverage exclusions or prohibitions.

compensation for innocent victims should override the crime exclusion under the cir-

cumstances of this case.

After the transaction, the clerk handed the driver a folded pamphlet, several pages long, entitled "Rental Agreement." The conditions and terms of this agreement, though in small print, are still legible. The pamphlet is organized into sections addressing major rental-car topics. One section spells out, in capitalized block letters, how a renter can violate the terms of the agreement by engaging in a prohibited use of the vehicle, along with the attendant consequences for such a violation:

THE VEHICLE MAY NOT BE USED ... (3) IN A RACE OR SIMILAR CONTEST ...; (4) FOR ANY ILLEGAL PURPOSE, OR IN THE COMMISSION OF A CRIME THAT COULD BE CHARGED AS A FELONY; (5) WHILE THE DRIVER IS UNDER THE INFLUENCE OF ALCOHOL OR DRUGS; ... (7) TO INTENTIONALLY CAUSE DAMAGE, OR DAMAGE THE VEHICLE BY WILLFUL, RECKLESS OR WANTON MISCONDUCT ...

**ANY PROHIBITED USE OF THE VEHICLE VIOLATES THE AGREEMENT AND VOIDS OR DEPRIVES YOU OF BENEFITS, PROTECTION AND OPTIONAL COVERAGES, IF ANY, TO WHICH YOU WOULD HAVE OTHERWISE BEEN ENTITLED UNDER THIS AGREEMENT.**

(emphasis in original). After this section, near the end of the rental agreement, another section appears, describing the insured's third-party liability responsibility as follows:

.... Where available, and for an additional daily charge, if You initialed that You accept the optional SLI at the beginning of rental, SLI provides You with protection against third-party auto liability claims as outlined below:

A. Dollar will protect You against third party liability claims arising out of the use or operation of the Vehicle for: (i) Bodily injury or death of another ... and (ii) Property damage other than to the Vehicle. This protection is limited to an amount equal to the minimum limits specified by the compulsory insurance or financial responsibility laws relating to automobile liability insurance in the state in which the Vehicle is rented and shall be referred to as Primary Protection; and

B. SLI provides You with a separate policy providing excess coverage against such claims for the difference between the Primary Protection and a maximum combined single limit of $1,000,000.00 (U.S.) per occurrence for bodily injury, including death and property damage, for other than the Vehicle while the Vehicle is on rent to you ...

3. You understand that SLI is void if You violate the terms of the Agreement. You understand SLI is subject to other specific exclusions, which are summarized on the separate SLI brochure which is available at the rental counter.

When the insured received the rental agreement, he did not read it. And although the rental agreement provided that a brochure describing the SLI coverage was available at the rental counter, the insured neither asked for nor received this brochure. He also never received the policy describing the SLI coverage.

Before going to prison, the insured assigned to the plaintiffs his rights to collect on the SLI coverage. After the collision, Lincoln General initiated a declaratory judgment action, claiming that, because of exclusionary policy language, it owed no duty to defend or to indemnify the insured, and was not liable to the plaintiffs for any losses arising from the collision. Ms. Bailey, on behalf of herself and her son's estate, filed two complaints: one against Lincoln General, alleging breach of contract, bad faith and violation of the Colorado Consumer Protection Act (the "CCPA"); and the other against the insured and Dollar for personal injury and wrongful death. The trial court held an uncontested hearing to determine damages, entering judgment against the driver for over $2 million. Dollar then settled with Ms. Bailey, for $25,000, on the primary policy it had issued to the insured.

Lincoln General moved for summary judgment, claiming it had not violated the CCPA, and arguing that the prohibitions in the rental agreement and policy absolved it of any liability to the plaintiffs. Specifically, Lincoln General claimed that the driver had

violated the contractual prohibitions on using the car: (1) "in the commission of a crime that could be charged as a felony"; (2) "to intentionally cause damage"; (3) "while ... under the influence of alcohol or drugs"; and (4) "in a race or similar type contest."

On a cross-claim for summary judgment, Ms. Bailey moved for partial summary judgment on the claim for breach of contract, claiming that the exclusions were ambiguous, unconscionable, violated public policy, and defeated the reasonable expectations of the insured.

The trial court granted Lincoln General's motion for summary judgment, declaring that Lincoln General could not be held liable for the insured's actions. Relying on just the language in the rental agreement and not the SLI policy, the trial court focused solely on the prohibition against using the vehicle in the commission of a crime that could be charged as a felony, and concluded that: the exclusion was clear and unambiguous, the prohibition did not violate public policy, and the driver had violated this prohibition. The trial court denied the plaintiffs' motion for partial summary judgment, finding no bad faith, breach of contract, or a violation of the CCPA.

The court of appeals affirmed, for substantially the same reasons the trial court articulated. The court of appeals concluded that the SLI coverage's criminal-acts exclusion was not ambiguous, did not violate public policy, and was not unconscionable. *Lincoln Gen.*, 224 P.3d at 339–42. The court also determined that the criminal-acts exclusion was not unenforceable under the doctrine of reasonable expectations, which did not apply because that doctrine, according to the court, is only "an interpretive tool used to resolve ambiguity." *Id.* at 339.

### III. Public Policy

■ The plaintiffs contend that the court of appeals erred in concluding that the criminal-acts exclusion in an excess-insurance policy is not void for violating public policy. We conclude that although Colorado's public policy is concerned with protecting innocent tort victims, it is also concerned with insurers' freedom to contract, allowing insurers to lim-

it their liability to calculable risks, excluding liability for the intentional misconduct of insureds that significantly increases insurers' risk of liability. Accordingly, the criminal-acts exclusion in this case does not violate public policy.

■ Insurance provisions that violate public policy may be declared void and unenforceable. *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo.1998). We apply a de novo standard of review when examining whether insurance-policy provisions are contrary to public policy. *See State Farm Mut. Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 183 (Colo.2004). We determine whether a public-policy violation exists based on the particular facts of the case before us. *Russell v. Courier Printing & Pub. Co.*, 43 Colo. 321, 326, 95 P. 936, 938 (1908); *see also Lowery v. Zorn*, 243 Ala. 285, 9 So.2d 872, 874 (1942) ("The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reason on which the doctrine rests.").

■ In determining whether insurance provisions are void as against public policy, our primary focus has been whether they attempt to "dilute, condition, or limit statutorily mandated coverage." *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo.1990) (quoting *Meyer v. State Farm Mut. Auto. Ins. Co.*, 689 P.2d 585, 589 (Colo. 1984)). We review the public-policy validity of the criminal-acts exclusion in light of Colorado's insurance statutes, as "[s]tatutes by their nature are the most reasonable and common sources for defining public policy." *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo.1996).

The criminal-acts in the insurance policy here is framed in terms of a prohibition, the violation of which deprives the insured of coverage benefits: "THE VEHICLE MAY NOT BE USED ... IN THE COMMISSION OF A CRIME THAT COULD BE CHARGED AS A FELONY...."

There are no Colorado statutes establishing the public-policy desirability of criminal-acts exclusions in excess-insurance policies. Nevertheless, the plaintiffs point us to three

statutes they claim this exclusion dilutes, conditions, or limits. The first is section 10–4–619(1), C.R.S. (2010), which requires motor-vehicle owners to "have in full force and effect" a policy that complies with mandatory-insurance statutes. The second is section 10–4–620, which specifies the insurance-coverage amounts that automobile owners must carry. And the third is the legislative declaration for Colorado's Motor Vehicle Financial Responsibility Law, which assigns penalties for failing to carry required insurance coverage and states, in part, that "it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists." § 42–7–102, C.R.S. (2010).

 Our court of appeals correctly noted that the SLI coverage here, as excess insurance, is not subject to the requirements of these statutes, which only apply to statutorily mandated coverage. Nevertheless, as partly shown by these three statutes, "[i]n Colorado, there is a strong public policy in favor of protecting tort victims; this is a fundamental purpose of insurance coverage, whether or not the state makes the particular coverage mandatory to obtain." *Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 646 (Colo.2005). Hence, that the criminal-acts exclusion is not subject to the specific requirements these statutes impose does not conclude our analysis of whether it violates principles of public policy inherent in these and other statutes.

Given Colorado's strong public policy of protecting tort victims, we first consider whether the criminal-acts exclusion in this case is so broadly worded as to deprive the insured of fundamental coverage afforded by his excess-insurance policy, rendering coverage illusory.

At least one court has, based on the public-policy principle of protecting innocent tort victims, limited a criminal-acts exclusion that encompassed not just intentional criminal misconduct, but also criminally negligent misconduct characterized by gross "thought-lessness, inattention, or inadvertence." *Young v. Brown*, 658 So.2d 750, 753 (La.Ct. App.1995). Reasoning that losses "resulting from negligent, non-intentional conduct are precisely the losses a liability policy buyer expects to insure against," the *Young* court construed "the policy to provide coverage for damages arising from non-intentional acts that may rise to the level of criminal negligence." *Id.* at 753–54; *see also Allstate Ins. Co. v. McCann*, 471 Mich. 283, 683 N.W.2d 656, 660–62 (2004) (construing a criminal-acts exclusion so as not to eviscerate coverage for criminal acts that are not intentional in nature); *Nationwide Mut. Fire Ins. Co. v. Kubacko*, 124 Ohio App.3d 282, 706 N.E.2d 17, 23–24 (1997) (rejecting public-policy argument that an "undoubtedly criminal" act may not be insurable, considering that the act may have been negligent instead of reckless).

Because the exclusion in this case implicates all felonious conduct, it may be so broad as to reach circumstances that raise the issue addressed by the *Young* court and render the insurer's risk a nullity. *See Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 65 P.3d 449, 454 (Ariz.Ct.App.2003); *Young*, 658 So.2d at 753–55.

But these circumstances are not before us today. Here, the insured's felonious criminal misconduct rose far above the mere criminal negligence that concerned the *Young* court; the insured here was "aware that his conduct" was "practically certain to cause" "the death of a person." § 18–1–501(6), C.R.S. (2010); § 18–3–103(1), C.R.S. (2010). Thus, we need not address whether Lincoln General's use of the criminal-acts exclusion renders coverage illusory.

 We turn now to the more general question of whether Colorado's insurance laws give insurers of excess-insurance policies license to include criminal-acts exclusions, and conclude that they do. There are multiple, competing public-policy principles animating Colorado's insurance laws: not only is it the public policy of this state to protect tort victims, but it is also the public policy of this state to provide insurers and insureds the freedom to contract, allowing insurers to shift risk based on their insureds'

misconduct, especially when that misconduct significantly increases the risk of insurers' liability and may be encouraged by indemnification.

Colorado has a strong commitment to the freedom of contract. *Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.,* 246 P.3d 651, 662 (Colo.2011). Even within the context of statutorily mandated insurance, insurers are free to include "conditions and exclusions that are not inconsistent with" Colorado's mandatory insurance laws. § 10–4–623(1), C.R.S. (2010). For example, insurers may include other-insurance clauses in policies providing statutorily-required coverage. *Shelter,* 246 P.3d at 655.

This freedom to contract encompasses excess-insurance policies: "In the absence of statutory inhibition, an insurer may impose any terms and conditions consistent with public policy which it may see fit." *Chacon v. Am. Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo.1990) (quoting 12 Appleman, *Insurance Law and Practice* § 7004, at 37–39 (rev. ed. 1981) (footnotes omitted)).

The freedom to contract is especially important in the insurance industry, as insurance policy terms are the primary means by which parties distribute and shift risk. *See* 7 *Couch on Insurance* § 101–6 (2006); *see also Chacon,* 788 P.2d at 750 ("[A]n insurance contract is a mutual agreement, ratified by the insured by his acceptance, [and] both parties are bound by its provisions ....") (quoting 12 Appleman, *Insurance Law and Practice* § 7004, at 37–39 (rev. ed. 1981) (footnotes omitted)).

Insurers' freedom to contract generally allows them to provide coverage for losses caused by "fortuitous" events, and not for events "planned, intended, or anticipated." *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.,* 140 Wash.2d 517, 998 P.2d 856, 878 (2000) (quoting Lee R. Russ & Thomas F. Segalla, 7 *Couch on Insurance 3D* § 101:2, at 101–8 (1997)). The ability for insurers to limit coverage in this manner is "central to the notion of what constitutes insurance." *Id.* (quoting Eric Mills Holmes & Mark S. Rhodes, 1 *Appleman on Insurance 2D* § 1.4, at 26 (1996)). For example, intentional-act

exclusions "are necessary to help insurers set rates and supply coverage. If a single insured is allowed, through an intentional act, to consciously control risks covered by the policy, the central concept of insurance is violated." *State Farm Fire & Cas. Co. v. Leverton,* 314 Ill.App.3d 1080, 247 Ill.Dec. 762, 732 N.E.2d 1094, 1097 (2000); *see also Charter Oak Fire Ins. Co. v. Color Converting Indus. Co.,* 45 F.3d 1170, 1174 (7th Cir. 1995) ("Insurance companies are reluctant to insure against risks that the insured controls. Such insurance would give the insured an incentive to increase risk, since he would have shifted the cost of the increased risk to the insurance company.") Under Colorado's mandatory-insurance laws, this principle is evident in section 10–4–623(2)(a), which allows insurers to limit coverage "where the injured person ... [s]ustains injury caused by his or her own intentional act."

Most felonious criminal misconduct, like intentional misconduct, significantly alters the calculus of risk between the insurer and insured, subjecting the insurer to increased and significantly greater risk of liability. Just as intentional misconduct resulting in loss is not a "fortuitous" event properly subject to coverage, neither is most felonious criminal misconduct that "includes a voluntary act or the omission to perform an act which he is physically capable of doing." *See* § 18–1–502, C.R.S. (2010). Further, most insureds can keep themselves from engaging in felonious criminal conduct in the same way that "[m]ost individuals can protect themselves from causing intentional harm." *See Am. Family Mut. Ins. Co. v. Johnson,* 816 P.2d 952, 955 (Colo.1991) (quoting Appleman, *Insurance Law and Practice* § 4492.01, at 21 (1979)). Hence, Colorado's freedom of contract facilitates insurers' attempts to exclude criminal and intentional misconduct from the general risk pool, thereby reducing premiums for insureds. *See Slayko v. Sec. Mut. Ins. Co.,* 98 N.Y.2d 289, 746 N.Y.S.2d 444, 774 N.E.2d 208, 212 (2002).

Finally, public policy is also concerned with insurers giving insureds license to engage in intentional misconduct, which may be "more likely if ... insured[s] believe [they] will not

have to bear the financial costs of the intentional conduct." 7 *Couch on Insurance* § 101–21 (2006). In examining a provision in a homeowner's policy excluding from coverage bodily-injury and property-damage "intended by any insured," we concluded that "[t]he purpose of the exclusion of intentional injuries from coverage is to prevent extending to the insured a license to commit harmful, wanton or malicious acts. This purpose serves a valid public policy." *Johnson*, 816 P.2d at 954, 957 (citations omitted). The concern with giving insureds license to engage in intentional misconduct applies with equal force to most felonious criminal misconduct. *See Home Ins. Co. v. Neilsen*, 165 Ind.App. 445, 332 N.E.2d 240, 244 (1975) ("[A] person should not be permitted to insure against harms he may intentionally and *unlawfully* cause others, and thereby acquire a license to engage in such activity." (emphasis added)), *quoted in Johnson*, 816 P.2d at 957.

Indeed, this public-policy principle is so compelling that, in many jurisdictions, insurers may actually violate public policy if they fail to include criminal-acts or intentional-acts exclusions in their policies. *See, e.g., Freightquote.com, Inc. v. Hartford Cas. Ins. Co.*, 397 F.3d 888, 893 (10th Cir.2005) (applying Kansas law); *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F.Supp. 155, 162–63 (E.D.Va.1993), *aff'd*, 48 F.3d 778 (4th Cir. 1995) (applying Virginia law); *Wilshire Ins. Co. v. S.A.*, 224 Ariz. 97, 227 P.3d 504, 506–07, 509 (Ariz.Ct.App.2010), review denied (Sept. 21, 2010); *State Farm Fire & Cas. Co. v. Schwich*, 749 N.W.2d 108, 114 (Minn.Ct. App.2008); *Pub. Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810, 814 (1981); *State Farm Mut. Auto. Ins. Co. v. Martin*, 442 Pa.Super. 442, 660 A.2d 66, 68 (1995); *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636, 640–41 (S.D.1995).[2]

In light of the competing public-policy principle of giving insurers the freedom to limit through contract their liability for their insureds' intentional misconduct, and in the absence of any statutory mandate suggesting otherwise, the criminal-acts exclusion here does not violate public policy as applied in this case. Lincoln General exercised its freedom to contract and limited its risk by excluding criminal acts that, if covered, would significantly increase its scope of liability.

## IV. The Doctrine of Reasonable Expectations

The plaintiffs contend that they are entitled to the SLI coverage because of the doctrine of reasonable expectations. Their reasonable-expectations argument is twofold. First, they contend that, considered from the perspective of the insured, the rental agreement is ambiguous, entitling them to coverage. And second, they argue that under the circumstances of this case, the insertion of the criminal-acts exclusion was unconscionable, violating the insured's reasonable expectations.

▉ Before addressing the plaintiffs' argument, we must first clarify Colorado's formulation of the doctrine of reasonable expectations. Given insurance policies' unique nature, which includes significant potential for insurers to take advantage of or mislead insureds, such policies are subject to heightened scrutiny, including the doctrine of reasonable expectations, which obligates insurers to clearly and adequately convey coverage-limiting provisions to insureds. In Colorado, the reasonable expectations of insureds have succeeded over exclusionary policy language in two main situations: (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the

---

**2.** Of course, many jurisdictions, although not recognizing a public-policy requirement for insurers to include intentional or criminal-act exclusions, hold that public policy is not violated where insurers include in liability or excess-insurance policies criminal-acts or other similar exclusions directed towards intentional conduct. *See, e.g., Philadelphia Indem. Ins. Co. v. Carco Rentals, Inc.*, 923 F.Supp. 1143, 1151–53

(W.D.Ark.1996) (applying Arkansas law); *Hertz Corp. v. Pap*, 923 F.Supp. 914, 921–24 (N.D.Tex. 1995) (applying Texas law); *Alfa Specialty Ins. Co. v. Jennings*, 906 So.2d 195, 198–202 (Ala.Civ. App.2005); *Collins v. Randall*, 836 So.2d 352, 357–58 (La.Ct.App.2002); *Speros v. Fricke*, 98 P.3d 28, 37 (Utah 2004) (intentional-acts exclusions are unenforceable "up to the minimum liability limits prescribed by ... statute").

coverage at issue; and (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise. Applying this doctrine to the present case, we determine that enforcing the criminal-acts exclusion does not violate the objectively reasonable expectations of the insured.

## A. Insurance Policies as Standardized Agreements

We have long viewed insurance policies with a critical eye, as such policies, although they may not technically qualify as contracts of adhesion, *see Schmidt v. Midwest Family Mutual Insurance Co.*, 426 N.W.2d 870, 874 (Minn.1988), are not ordinary, bilateral contracts, either; they are "not the result of bargaining" and are often imposed on a "take-it-or-leave it basis," *Huizar v. Allstate Insurance Co.*, 952 P.2d 342, 344 (Colo.1998). Because of the unequal bargaining position between insurers and insureds, and because insureds are generally not "highly sophisticated in the art of reading insurance policies," *State Farm Mutual Automobile Insurance Co. v. Nissen*, 851 P.2d 165, 167 (Colo.1993), an increased risk exists that insurers may intentionally, or inadvertently, exploit insureds.

In *Davis v. M.L.G. Corp.*, 712 P.2d 985, 992 (Colo.1986), in the context of considering whether exclusionary language in a rental agreement should be enforced, we recognized the dangers that standardized contracts—which often include insurance policies—pose to consumers.[3] We acknowledged that such contracts are "seldom" read by consumers,

and that because they may grant coverage "prominently on the face of the agreement," but may bury exclusions "in fine print elsewhere in the document," average customers may "reasonably conclude that [they are] protected against most, if not all, risks," when in fact they may not be. *Id.*[4]

Because of the nature of insurance policies, courts have a duty to scrutinize them closely for "provisions that unduly compromise the insured's interests." *Huizar*, 952 P.2d at 344. Courts have a " 'heightened responsibility' in reviewing insurance policy terms to ensure that they comply with 'public policy and principles of fairness.' " *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501–02 (Colo. 2004) (quoting *Huizar*, 952 P.2d at 344); *see also Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo.2004).

In Colorado, the doctrine of reasonable expectations is one of the principles of fairness to which insurance policies are subject, as it is designed to protect insureds from the dangers inherent in standardized insurance policies. We have earlier noted that public policy itself "favors protecting consumers by requiring those who sell insurance to disclose fully and fairly to the purchasing public what insurance protection is actually being provided for the premium charged." *Davis*, 712 P.2d at 990 n. 6 (citing *Newton v. Nationwide Mut. Fire Ins.*, 197 Colo. 462, 594 P.2d 1042 (1979)). The reason for this is because insurance is a unique product, which is purchased by insureds not to secure commercial advantage, but to protect "themselves from unforeseen calamities and for peace of mind." *Goodson*, 89 P.3d at 414. When insurers fail to fully and fairly

---

**3.** Although *Davis* dealt with a rental agreement and not an insurance policy, we concluded that the rental agreement was akin to an insurance policy in that it was a form contract prepared by the entity claiming the exclusion and offered on a take-it-or-leave-it basis. *Davis*, 712 P.2d at 989 n. 4. Hence, we deemed that "the appropriate interpretive principles" to apply to the rental agreement were "those normally applicable to insurance contracts." *Id.*

**4.** We are not alone in recognizing the risks for abuse in standardized insurance policies. *See, e.g., Stordahl v. Gov't Emp. Ins. Co.*, 564 P.2d 63, 65–66 (Alaska 1977); *Gordinier v. Aetna Ca. &*

*Sur. Co.*, 154 Ariz. 266, 742 P.2d 277, 282–83 (1987); *Zaragoza v. W. Bend Mut. Ins. Co.*, 549 N.W.2d 510, 515 (Iowa 1996); *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406, 414 (1985); *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 864 (Okla.1996). The Restatement (Second) of Contracts is in accord. Although it recognizes the value and commercial importance of standardized agreements, *see* Restatement (Second) of Contracts § 211 cmt. a (1981), it also recognizes that with such standardized agreements there is an "obvious danger of overreaching" by the party drafting the agreement, *id.* at cmt. c.

convey the extent of coverage provided, they undermine one of the fundamental purposes behind insureds' purchase of insurance.

### B. Manifestations of the Doctrine

Some confusion exists over the scope of the doctrine of reasonable expectations in Colorado. Courts do not disagree that it is implicated where there is a dispute about the existence of insurance coverage. *See Struble v. Am. Family Ins. Co.,* 172 P.3d 950, 957 (Colo.App.2007); *Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.,* 917 P.2d 321, 324 (Colo.App.1995); *Leland v. Travelers Indem. Co. of Ill.,* 712 P.2d 1060, 1064 (Colo. App.1985). Courts also agree that it somehow supplements, but does not replace, traditional principles of contract interpretation. *Spaur v. Allstate Ins. Co.,* 942 P.2d 1261, 1265 (Colo.App.1996); *Shean v. Farmers Ins. Exch.,* 934 P.2d 835, 841 (Colo.App.1996). But Colorado courts have disagreed, and have not always been clear, over how the doctrine supplements traditional contract principles, including the manner and degree to which it deviates from those principles. *See, e.g., Lincoln Gen.,* 224 P.3d at 339 (stating that the doctrine of reasonable expectations is an interpretative tool used to resolve an ambiguity); *Struble,* 172 P.3d 950, 957 (Colo.App.2007) (recognizing the doctrine of reasonable expectations as a promissory-estoppel hybrid); *McGowan v. State Farm Fire & Cas. Co.,* 100 P.3d 521, 525 (Colo.App. 2004) (stating that the doctrine of reasonable expectations serves to protect insureds from coverage exclusions "that are either not readily apparent or ambiguous"); *Shelter Mut. Ins. Co. v. Breit,* 908 P.2d 1149, 1152 (Colo.App.1995) (observing that the doctrine of reasonable expectations may be appropriate in "unique circumstances or circumstances of extreme unconscionability").

There are two main ways in which the doctrine of reasonable expectations has manifested itself in Colorado, ensuring that insurers have "fully and fairly" conveyed coverage limitations to insureds. The first is where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue. Applying this source of reasonable expectations to the facts of this case, we conclude that the language of the rental agreement would not lead an ordinary, objective insured to expect coverage for his criminal acts.

The second manifestation of the doctrine is where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise. Applying this principle here, we conclude that the plaintiff cannot point to any circumstances attributable to the insurer that would lead him to expect coverage for his criminal acts, especially in light of the fact that an objectively reasonable insured would not expect to be able to insure such behavior.

#### 1. Language of Policy

##### a. Legal Principles

Colorado courts have honored the reasonable expectations of an insured where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue. This manifestation of the doctrine of reasonable expectations applies when policy coverage-provisions may not be ambiguous in a technical sense, and hence subject to the rule that ambiguities must be construed against the drafter, but are ambiguous from the perspective of an ordinary reader. In such cases, exclusionary language may be held unenforceable.

Insurance policies are subject to contract interpretation, *Radil v. National Union Fire Insurance Co. of Pittsburg, PA,* 233 P.3d 688, 692 (Colo.2010), and like contracts are reviewed de novo, with the ultimate aim of effectuating the contracting parties' intentions. *Ad Two, Inc. v. City & County of Denver ex rel. Manager of Aviation,* 9 P.3d 373, 376 (Colo.2000); *State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997). But while the language in regular contracts "must be examined and construed in harmony with the plain and generally accepted meaning of the words employed," *Ad Two,* 9 P.3d at 376, insurance

policies "must be given effect according to the plain and *ordinary* meaning" of their terms, *Terranova,* 800 P.2d at 59 (emphasis added).

As we observed in *Carroll v. CUNA Mut. Ins. Soc.,* 894 P.2d 746, 749–50 (Colo.1995), "[w]e have adopted the common meaning of words in construing insurance contracts to ensure that the reasonable expectations of an ordinary individual purchasing the contract will be fulfilled." For example, in *Simon v. Shelter General Insurance Co.,* an insurance policy contained a broad grant of coverage and two exclusions that conflicted over whether coverage existed for a products-related defect that caused injury. 842 P.2d 236, 238–39 (Colo.1996). Even though one of the exclusions contained an exception that, if read technically, would have removed the conflict between the exclusions, we rejected the technical reading of the policy because the construction of insurance contracts "must be ascertained by reference to what meaning a person of ordinary intelligence would attach to it." *Id.* at 239–40; *see also Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co.,* 35 F.3d 494, 497 (10th Cir.1994) (applying Colorado's doctrine of reasonable expectations, rejecting a technical construction of a policy term and instead interpreting the term as reasonable person of ordinary intelligence would); *Hoang v. Assurance Co. of Am.,* 149 P.3d 798, 803 (Colo.2007) ("An insurance policy must be construed to meet the reasonable expectations of the insured."); *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 306 (Colo.2003).

■ And under the doctrine of reasonable expectations, the whole policy is construed as it would be understood by an ordinary insured. *See Cyprus,* 74 P.3d at 299 ("Courts should read the provisions of the policy as a whole, rather than reading them in isolation."). For example, in *Nissen,* an insured was injured by her automobile while attempting to recover it from a thief. 851 P.2d at 167–68. The insurer denied primary coverage because the thief did not have the insured's requisite consent to drive the automobile. *Id.* at 166. The insurer also denied uninsured-motor-vehicle coverage because of an exclusion stating that such coverage does not include an automobile insured under the policy. *Id.* But that exclusion only appeared *after* a section that had already defined an uninsured motor vehicle as one where the "insuring company denies coverage." *Id.* at 167. We held that the insured, as an ordinary reader, had a reasonable expectation of coverage once her insurance company denied her coverage, despite exclusionary language that appeared later in the policy. *Id.* at 168.

■ If, based on how an ordinary, objectively reasonable insured would read the whole policy, the question of whether certain coverage exists is "susceptible to more than one reasonable interpretation," *Cary v. United of Omaha Life Ins. Co.,* 108 P.3d 288, 290 (Colo.2005), then the coverage provisions are ambiguous, to be construed against the insurer as the drafter of the policy, *Nissen,* 851 P.2d at 166.

■ When honoring the insured's expectations through this manifestation of the doctrine of reasonable expectations, insureds do not actually have to have read their policies; the test to be applied is "what the ordinary reader and purchaser *would* have understood" insurance provisions to mean had they been read. *Davis,* 712 P.2d at 989 (emphasis added) (quoting *Quigley,* 373 A.2d at 812); *see also Hoang,* 149 P.3d at 803 (stating, as a hypothetical matter, that a "reasonable insured carefully reading" an insurance policy "would find no indication" of a coverage limitation). In addition, the question of whether an ambiguity exists is always an objective test: policy "terms should be read in the sense in which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser." *Davis,* 712 P.2d at 989 (quoting *Quigley,* 373 A.2d at 812).

### b. Application

■ Turning to explore whether the rental agreement in this case violated this manifestation of the doctrine of reasonable expectations, we review de novo the trial court's grant of summary judgment, "ever mindful that summary judgment is appropriate only when the pleadings and supporting documents show there to be no genuine is-

sues as to any material fact, and thus that the moving party is entitled to summary judgment as a matter of law." *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074 (Colo.2010), *as modified* (Dec. 13, 2010). We conclude that, based on the policy of the language, the insured has no reasonable expectations of coverage for his criminal acts.

Reading the rental agreement, an ordinary reader would first learn, from a section describing the prohibited uses of the vehicle, that using the car in a prohibited manner may void benefits and protections. After proscribing nine different uses, including the use of the car in felonious criminal acts, this prohibited-uses section states the following in bold type:

> **ANY PROHIBITED USE OF THE VEHICLE VIOLATES THE AGREEMENT AND VOIDS OR DEPRIVES YOU OF BENEFITS, PROTECTION AND OPTIONAL COVERAGES, IF ANY, TO WHICH YOU WOULD HAVE OTHERWISE BEEN ENTITLED UNDER THIS AGREEMENT.**

Hence, at this point, an ordinary reader could reasonably conclude that any and all protections conferred by the rental agreement may be rendered unavailable by engaging in a prohibited use of the vehicle.

Then, when reading the section describing third-party liability, which appears after the prohibited-uses section and near the end of rental agreement, the insured would receive confirmation that using the automobile in a prohibited manner would void SLI coverage, as one paragraph clearly states that SLI coverage will be unavailable to the insured based on a violation of the rental agreement: "You understand that SLI is void if You violate the terms of the Agreement."

Hence, because the insured would have always clearly understood that SLI coverage could be voided upon a violation of the rental agreement, the language of the rental agreement would not lead an ordinary, objective insured to expect SLI coverage where the insured uses the car to commit a felonious criminal act.

 The plaintiffs argue, nevertheless, that because there is an ambiguity in the rental agreement[5] regarding primary coverage provided by Dollar, the doctrine of reasonable expectations entitles them to SLI coverage.[6] We agree that, from the perspective of an ordinary insured, there is an ambiguity concerning whether primary coverage may be vitiated by a prohibited use of the rental car. This ambiguity stems from two sources: first, the prohibited-uses section of the rental agreement, which broadly states that "any prohibited use of the vehicle . . . deprives you of benefits, protection and optional coverages"; and second, a paragraph appearing later in the rental agreement, which does not adequately inform the insured that primary coverage cannot be vitiated by a prohibited use of the vehicle, because it only states that Dollar's primary coverage will protect the insured up to "an amount equal to the minimum limits specified by the compulsory insurance or financial responsibility laws." Because an insured cannot be expected to know the legal intricacies of compulsory insurance laws and the nature of primary insurance, the insured would not know whether primary coverage could be voided by a violation of the rental agreement.

The plaintiffs' argument continues that, because of this ambiguity that may lead an ordinary insured into believing that primary coverage could be voided—which, according to the plaintiffs, would restrict statutorily required coverage in a manner that violates

---

5. In line with the obligation for insurers to fully and fairly disclose coverage obligations, the trial court and court of appeals properly limited their discussion to the language in the rental agreement and not to the SLI policy the insured never received.

6. Although Lincoln General argues that plaintiffs did not preserve this issue for appeal, we conclude that they have sufficiently preserved this

issue because they: (1) argued to the trial court and court of appeals the doctrine of reasonable expectations, which involves questions of ambiguity; (2) contended that, "from the perspective" of the insured, the rental agreement violated the insured's reasonable expectations; and (3) cited relevant portions of the rental agreement, *see American Family Mutual Insurance Co. v. Allen*, 102 P.3d 333, 340 (Colo.2004).

public policy[7]—the exclusionary language should be stricken, entitling them to SLI coverage.

■ The plaintiffs' argument is not persuasive. Although ambiguous policy language shrouds the insured's ability to recover benefits under his primary insurance policy issued by Dollar, no such ambiguous policy language applies to his excess-insurance policy, the benefits of which are sought by the plaintiffs but denied by Lincoln General. The only relevant ambiguities under the doctrine of reasonable expectations are those that relate to the coverage the insured claims and reasonably expects, and which the insurer later denies. *See Reg'l Bank of Colo.*, 35 F.3d at 495–96; *Simon*, 842 P.2d at 238–39; *Nissen*, 851 P.2d at 166–68. Here, the primary insurance provided by Dollar is not at issue; Dollar settled with the plaintiffs for that coverage. The only coverage in question is the SLI coverage, and, as discussed above, no ordinary, objectively reasonable insured would, based on the language of the policy, fail to understand that he or she is not entitled to SLI coverage in the event he or she uses the rental car contrary to the criminal-acts exclusion.

### 2. Deception

■ Colorado courts have honored the reasonable expectations of an insured where circumstances attributable to an insurer have deceived ordinary, objectively reasonable insureds into believing that they are entitled to coverage, while the insurer would maintain they do not enjoy such coverage.

■ Hence, we disagree with the court of appeals' assessment that the doctrine of reasonable expectations only applies as an interpretive tool to resolve ambiguities. Indeed, as seen above, the doctrine of reasonable expectations assists in establishing whether ambiguities exist at all. But more deeply, the court of appeals' view conflicts with the underlying rationale in our *Davis* decision.

In *Davis*, we addressed the validity of an exclusion in a physical damage waiver that was part of a car rental agreement between a lessor and lessee. 712 P.2d at 989, 992. The lessee in *Davis*, while under the influence of alcohol, crashed and totaled his rental car. *Id.* at 987. The lessor claimed that the physical damage waiver, which the lessee had specially purchased, was not available to the lessee to cover damages, as the lessee had violated the waiver's exclusion for damages resulting from driving under the influence, and that exclusion was neither ambiguous nor unconscionable. *Id.* at 988.

Although the prohibition was not ambiguous, and although we never declared that the prohibition itself was unconscionable, we nevertheless held the exclusion unenforceable. *Id.* at 992. We concluded that the prohibition excluded coverage in an "unconscionable manner," and we did so not only in reference to traditional factors of unconscionability, but also in light of the reasonable expectations of the lessee. *Id.* at 986, 989, 991–92.

We embraced the broader concept of reasonable expectations because we wished to adopt a principled approach that could be used by courts where "a lease agreement is not ambiguous in the sense that the instrument is subject to two possible interpretations," but nevertheless where "the deceptive character of language ... leads an average renter to believe that he or she has paid for broad protections against collision liability," when in fact the lessor would argue that he or she does not possess such protections. *Id.* at 989. Hence, we envisioned courts making use of the doctrine precisely where no ambiguity existed, so that courts would not strain to find an ambiguity that could be construed against the drafter; instead, courts would have the authority to avoid a manifestly unfair result not by reference to any purported ambiguity, but by reference to reasonable expectations. *See id.* at 988–90.

---

7. We do not address whether, in light of the sunset of the No–Fault Act, *see Shelter*, 246 P.3d at 660, and in light of a recent federal district court case addressing the matter, *see Government Employees Insurance Co. v. Brown*, 739 F.Supp.2d 1317, 1323 (D.Colo.2010), the insertion of intentional—or criminal-acts exclusions into policies providing mandatory insurance are contrary to public policy.

We acknowledged that the framework we adopted deviated from several well-established rules governing the construction of contracts, including "the tenet that a party is presumed to know the content of a contract signed by him, the precept that contracts which are free from ambiguity are to be enforced as written, and the maxim that specific clauses control the effect of general clauses." *Id.* at 990 n. 7 (citations omitted).[8] Hence, we anticipated that honoring the reasonable expectations of insureds over exclusionary contract language may be appropriate even in the absence of contract ambiguity.

■ This said, the doctrine of reasonable expectations "does not contemplate the expansion of coverage on a general equitable basis." *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995). The "bare allegations" of policyholders that they expected certain coverage are insufficient to establish grounds for relief sounding in reasonable expectations. *O'Neill Investigations, Inc. v. Ill. Emp. Ins. of Wausau*, 636 P.2d 1170, 1177 (Alaska 1981). As an example of this, in *Tynan's Nissan*, 917 P.2d at 324, the insured argued that it had a subjective expectation of coverage owing to the "comprehensive nature" of the policy it believed it was purchasing. *Id.* But the plain and ordinary language of the policy did not provide the coverage, *id.*, and the insured pointed to no other facts or circumstances giving rise to coverage expectations. Hence, the court of appeals correctly rejected the insured's argument.

■ In order for reasonable expectations to prevail over exclusionary policy language, an "insured must demonstrate through extrinsic evidence that its expectation[s] of coverage [are] based on specific facts which make these expectations reasonable." *O'Neill*, 636 P.2d at 1177. These specific facts must show that, through procedural or substantive deception attributable to the insurer, an objectively reasonable insured would have believed he or she possessed coverage later denied by an insurer.

*Davis* is a unique case because both procedural and substantive deceptiveness combined to give rise to the lessee's coverage expectations. Substantively, the lessee's reasonable expectation of coverage partly came from how a "normal" person would understand the nature of a physical damage waiver, which, at the time, was framed by the public policy behind no-fault insurance. *Davis*, 712 P.2d at 992. We observed that "[c]ollision insurance is generally understood to cover whatever accidents occur, regardless of the fault of the operator." *Id.* at 990 (quoting *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 373 A.2d 810, 812 (1977)). Indeed, when analyzing the physical-damage-waiver exclusion in *Davis* as insurance, the trial court held that the lessor had, contrary to the public policy principles behind the No-Fault Act, tried to "inject a fault element" into its insurance. *Id.* at 987. Because the average, reasonable person would expect a physical damage waiver to cover damages regardless of fault, that person would also "be warranted in concluding that any significant limitation on collision insurance would have been explicitly noted." *Id.* at 990 (quoting *Quigley*, 373 A.2d at 812). This substantive deception was attributable to the lessor because it, like insurers, should recognize their insureds' reasonable expectations sounding in public policy and commercial reasonability. *See* Eugene R. Anderson & James J. Fournier, *Why Courts Enforce Insurance Policyholders' Objectively Reasonable Expectations of Insurance Coverage*, 5 Conn. Ins. L.J. 335, 346 (1998) (Insurers are "expected to know the policyholder's objectively reasonable expectations of insurance coverage . . . .").

Procedural deceptiveness could also be attributed to the lessor in *Davis*, as the lessor failed to adequately communicate the coverage exclusion to the lessee. On the front side of the rental agreement, three different options were listed for reducing the lessee's responsibility for physical damage occurring

---

8. But we also noted that an approach honoring reasonable expectations was in harmony with several other interpretive rules applied to contracts, including "the central policy underlying contract law, that of construing contracts so as to effectuate the parties' intentions." *Davis*, 712 P.2d at 990.

to the rental car, one limiting the amount to $500, another to $350, and the last, the physical damage waiver, absolving the lessee from all responsibility. 712 P.2d at 986. The prohibition against drunk-driving did not appear in this section, or even on this page, but on the reverse side of the agreement, in small, off-color, light grey type that was "almost impossible" to read. *Id.* at 986, 992. The lessor's rental agent had never seen any lessee read the reverse side of the agreement. *Id.* at 992. Hence, the manner in which the lessor conveyed the exclusions amounted to a "concerted effort" to discourage persons, including the lessee, from reading about and discovering the exclusions. *Id.* Further, the exceptions to the physical damage waiver were never brought to the lessee's attention, even though other clauses relating to the lessee's responsibility were. *Id.* All these actions were directly attributable to the lessor.

Because *Davis* involved both procedural and substantive deception, the traditional factors of unconscionability were uniquely suited to help determine the reasonable expectations of the lessee, as "[a] party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability." *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 655 S.E.2d 362, 370 (2008). *See also In re Marriage of Ikeler*, 161 P.3d 663, 667 (Colo.2007) ("Unconscionable contract provisions, particularly in the context of marital agreements, are unconscionable precisely because they violate public policy."); *Davis*, 712 P.2d at 991 (stating that, to support a finding of unconscionability, there must be "contract terms which are unreasonably favorable" to the party who overreached).[9]

But since *Davis,* Colorado courts, ourselves included, have upheld reasonable coverage-expectations on facts grounded only in procedural deceptiveness.[10] Partly because of the risk for procedural deceptiveness, in *Cyprus* we embraced the rule that "[i]nsurers seeking to avoid liability 'must do so in clear and unequivocal language and must call such limiting conditions to the attention of the insured.'" 74 P.3d at 307 (quoting *Tynan's Nissan*, 917 P.2d at 324).

For example, in *Shelter,* we precluded an insurer from relying on a coverage-reduction limitation that was included in a renewal policy, but which was not "clearly and unequivocally" conveyed to the insured at the time of renewal. 246 P.3d at 658–59. The circumstances of the policy-renewal period and the lack of notice—both of which were attributable to the insurer—gave rise to objectively reasonable expectations of coverage, as we observed that "[u]nless adequately notified otherwise, an insured may rely 'on the assumption that the renewal contract provisions remain[ ] unchanged.'" *Id.* at 658 (quoting *Gov't Emp. Ins. Co. v. United States*, 400 F.2d 172, 175 (10th Cir.1968)); *see also Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1330–31 (Colo. App.1994) (upholding the reasonable expectations of the insured where the insurer removed coverage for a treatment from an insurance policy, but did not provide the insured with adequate notification of the reduction in coverage).

In a similar vein, in *Leland v. Travelers Indemnity Co. of Illinois,* the insured purchased an insurance policy but failed to timely pay the premium. 712 P.2d 1060, 1063

---

**9.** Looking at the unconscionability factors used in *Davis*, it is apparent that two of the factors deal primarily with substantive deceptiveness, including "absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated ... [and] the terms of the contract, including substantive unfairness." *Davis*, 712 P.2d at 991 (citations omitted). In contrast, four of the unconscionability factors explore procedural deceptiveness, including "a standardized agreement executed by parties of unequal bargaining strength, lack of opportunity to read or become familiar with the document before signing it; use of fine print in the portion of the contract containing the provision, [and]

the relationship of the parties, including factors of assent, unfair surprise and notice." *Id.* (citations omitted). Both substantive and procedural aspects combine in the last factor, which is "all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect." *Id.* (citations omitted).

**10.** One likely explanation for this is that the doctrine of reasonable expectations is not necessary where policy provisions conflict with public policy; such provisions are simply void. *See Peterman*, 961 P.2d at 492.

(Colo.App.1985). After the insured received a notice stating that the policy would be cancelled unless payment was received by a certain date, he sent in a check, which he, through oversight, neglected to sign. *Id.* The insurer then sent a form letter to the insured stating that it was unable to process the payment because of the missing signature, and asking the insured to correct the problem and return the check signed; the letter did not state his insurance had been cancelled because the payment due-date had already passed. *Id.* The insured immediately returned a signed check, but the insurer returned payment to him because the policy had already been cancelled. *Id.* Our court of appeals held that the doctrine of reasonable expectations precluded the insurer from denying coverage, as "an ordinary layperson" reading the form letter "could reasonably conclude that execution and return of the unsigned check would result in continued or reinstated coverage." *Id.* at 1064. The form letter, attributable to the insurer, established reasonable coverage expectations. *See also State Comp. Ins. Fund v. Wangerin,* 736 P.2d 1246, 1248 (Colo.App.1986) (holding that an insurer's acceptance of a premium created reasonable expectations of coverage in the insured).

### b. Application

Applying the same summary judgment standards discussed above to this manifestation of the doctrine of reasonable expectations, neither substantive nor procedural deception exist sufficient to establish an insured's objectively reasonable expectations of coverage for felonious criminal acts.

▮ Here, unlike *Davis,* there was no substantive deception that misled the insured into believing that the SLI coverage would extend to felonious criminal acts. The lessee in *Davis* could successfully claim that an objective person would expect a physical damage waiver to cover vehicle damage regardless of fault, as the No–Fault Act in

place at the time established the public-policy principles leading to that expectation of coverage. But the insured cannot claim the same here because, as discussed above, the criminal-acts exclusion does not violate public policy, nor, based on the number of states holding that indemnification for criminal or intentional acts is contrary to public policy, is it commercially unreasonable.[11]

In fact, going further, no objectively reasonable person purchasing liability coverage would presume coverage for his or her intentional, felonious, criminal acts. "Homicide, assault, kidnapping, sexual assault, arson, burglary, and robbery are all Malum per se, and protestations by the accused that such conduct is blameless is irrational." *People v. Washburn,* 197 Colo. 419, 425, 593 P.2d 962, 966 (1979). As one court has said, "No reasonable purchaser of a liability policy could expect to insure himself against losses arising from [offenses such as murder or aggravated battery]." *Young,* 658 So.2d at 753. Whereas in *Davis* public policy significantly helped to establish reasonable coverage expectations, here the opposite is true: public policy and commercial reasonability actually undermine any expectation for criminal-acts coverage. Therefore, the plaintiffs must show that, under the facts of this case and through procedural circumstances attributable to the insurer, the insured was deceived into believing he possessed coverage for criminal acts that he would not presume to have had.

But no such procedural deception exists here. In line with *Tynan's,* and in contrast to *Shelter* and *Tepe,* the insured in this case received a copy of a rental agreement that "clearly and unequivocally" contained the coverage exclusion. Although the plaintiffs argue that the rental agreement was in fine print, it was not so fine that it was "impossible to read," like the print in *Davis.* Further, it cannot be said that there was a "concerted effort" to hide the exclusion. In *Davis,* the exclusion was obscured by its placement on the reverse of the agreement.

---

11. It is for this reason that we need not directly assess whether the criminal-acts exclusion is unconscionable. As discussed above, a contractual provision may only be held unconscionable so long as the provision is in some way substantive-ly unconscionable. *See supra,* 1055–56; *Tillman,* 655 S.E.2d at 370. Here, because the criminal-acts exclusion is not substantively unconscionable, it cannot be held unconscionable.

But here, the exclusionary language actually comes before the language granting SLI coverage, appearing in capitalized, bold print. But more fundamentally, in *Davis* the fine print worked to hide an exclusion that an ordinary person would not expect; here, the fine print contains an exclusion that an ordinary person would expect.

Granted, the rental clerk told the insured that the SLI protection "covered the car bumper to bumper; if he was to get into a wreck, the car was covered." This would likely have fostered coverage expectations in regards to the vehicle. And, because of the high policy limit—$1 million—it could have fostered general, third-party liability coverage expectations. But considering that no objectively reasonable person would expect coverage for his or her own criminal acts, the clerk's statement simply does not go far enough to engender criminal-acts coverage expectations.

■ There are other aspects of the transaction of which the plaintiffs complain, including the short duration of the transaction, the rental agreement's status as a standardized agreement, and the fact that the rental agent never told the insured about the criminal-acts exclusion. But these facts, on their own, do not engender expectations of criminal-acts coverage in this case. Therefore, we conclude that Lincoln General and its agents did not, from the perspective of an objectively reasonable insured, deceive its insured into believing that he enjoyed coverage for his own felonious criminal acts.

### V. Conclusion

For the foregoing reasons, we affirm the court of appeals. The criminal-acts exclusion, as applied in this case, does not violate public policy, and neither are the plaintiffs entitled to relief under the doctrine of reasonable expectations.