545 P.3d 942
2024 CO 13
Karyn GREGORY, Petitioner,
v.SAFECO INSURANCE COMPANY OF AMERICA, Respondent.
Lisa Runkel and Sylvan T. Runkel, III, Petitioners,
v.Owners Insurance Company, Respondent.
Supreme Court Case No. 22SC399, Supreme Court Case No. 22SC563
Supreme Court of Colorado.
March 11, 2024
Rehearing Denied April 15, 2024 Certiorari to the Colorado Court of Appeals, Court of Appeals Case Nos. 20CA1694, 21CA173 Attorneys for Petitioner Karyn Gregory: The Roth Group David M. Roth, Denver, Colorado Attorneys for Petitioners Lisa Runkel and Sylvan T. Runkel, III: MoGo LLC, Rodney J. Monheit, Katherine E. Goodrich, Denver, Colorado Attorneys for Respondent Safeco Insurance Company of America: Lewis Roca Rothgerber Christie LLP, Brian J. Spano, Kendra N. Beckwith, Holly C. White, Denver, Colorado Attorneys for Respondent Owners Insurance Company: Wells, Anderson & Race, LLC, Adam P. O’Brien, Lindsay M. Dunn, Denver, Colorado Attorneys for Amicus Curiae Colorado Defense Lawyers Association: Waltz | Reeves Christopher R. Reeves, Denver, Colorado Attorneys for Amicus Curiae Colorado Trial Lawyers Association: Levin Sitcoff Waneka PC, Bradley A. Levin, Nelson A. Waneka, Robyn Levin, Denver, Colorado Attorneys for Amici Curiae Complex Insurance Claims Litigation Association and American Property Casualty Insurance Association of America: Crowell & Moring LLP, Nicholas W. Dowd, Denver, Colorado En Banc JUSTICE GABRIEL delivered the Opinion of the Court, in which JUSTICE HOOD, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined. JUSTICE GABRIEL delivered the Opinion of the Court. ¶1 These cases require us to determine, for the first time, whether the notice-prejudice rule, which allows an insurer to deny coverage based on a claim’s untimeliness only if the insurer can show prejudice from the late notice, applies to occurrence policies in the context of first-party homeowners’ property insurance claims. Specifically, we must decide whether the policy considerations underlying our adoption of the notice-prejudice rule in the context of uninsured/underinsured motorist ("UIM") policies and third-party liability policies extend to occurrence-based, first-party homeowners’ property insurance policies.1 ¶2 We now conclude that the notice-prejudice rule applies to occurrence-based, first-party homeowners’ property insurance policies. We do so for two reasons. First, our recent cases have consistently applied the notice-prejudice rule to occurrence policies like those at issue, in which the purpose of notice is to allow an insurer to investigate and defend against the claim and is not a fundamental term defining the temporal boundaries of coverage (unlike in a claims-made policy). Second, the policy considerations that we identified in Clementi v. Nationwide Mutual Fire Insurance Company, 16 P.3d 223, 229–30 (Colo. 2001), for determining whether the notice-prejudice rule applies, namely, the adhesive nature of insurance contracts, the public policy objective of compensating tort victims, and the inequity of granting the insurer a windfall due to a technicality, all support the application of the notice-prejudice rule here. ¶3 Accordingly, we reverse the decisions of the divisions below in Gregory v. Safeco Insurance Company of America, 2022 COA 45, 514 P.3d 971, and Runkel v. Owners Insurance Company, No. 21CA173, 2022 WL 2431661 (June 30, 2022), and we remand both cases for further proceedings consistent with this opinion. I. Facts and Procedural History ¶4 The facts in the two cases now before us are similar and essentially undisputed. A. Gregory’s Claim ¶5 Karyn Gregory had a homeowners’ insurance policy with Safeco Insurance Company of America. The policy ran from February 15, 2017 to February 15, 2018 and provided, in pertinent part, "This policy applies only to losses occurring during the policy period." The policy further contained a notice provision that stated, "With respect to loss caused by the peril of Windstorm or Hail, the notice must be within 365 days after the date of the loss …." ¶6 On May 8, 2017, a hailstorm damaged the roof of Gregory’s home, although she alleges that she did not initially know that the storm had caused damage. She asserts that she first became aware of the damage approximately eighteen months after the hailstorm when a contractor inspected her home in connection with her preparing to sell it. Gregory first filed a claim for the hail damage on October 22, 2018, over five months after the 365-day notice period set forth in the policy had expired. ¶7 Safeco denied Gregory’s claim as untimely, and Gregory filed suit in the Denver District Court, asserting claims for a declaratory judgment, breach of contract, bad faith breach of the insurance contract, and the unreasonable delay and denial of payment of her claim in violation of sections 10-3-1115 and -1116, C.R.S. (2023). Safeco subsequently moved for summary judgment, and Gregory moved for a determination of a question of law under C.R.C.P. 56(h). The district court ultimately granted Safeco’s motion and denied Gregory’s motion, concluding, as pertinent here, that Gregory’s notice was untimely and unreasonable as a matter of law. ¶8 Gregory appealed, arguing that the district court had erred by not applying Colora- do’s notice-prejudice rule to the notice-of-loss provision in her homeowners’ policy. Gregory, ¶ 12, 514 P.3d at 973. In a unanimous, published decision, however, a division of the court of appeals affirmed the district court’s judgment. Id. at ¶¶ 2, 45, 514 P.3d at 972, 980. In so ruling, the division concluded that only this court could extend the notice-prejudice rule to first-party claims under homeowners’ insurance policies. Id. at ¶ 2, 514 P.3d at 972. Accordingly, the division felt bound to apply the so-called "traditional approach," under which the notice provision was a condition precedent to Gregory’s right to recover for the hail damage. Id. at ¶¶ 38–39, 514 P.3d at 979. Concluding that Gregory had not satisfied this condition precedent, the division determined that Gregory’s unexcused late notice relieved Safeco of its obligation to cover the loss. Id. at ¶ 38, 514 P.3d at 979. B. The Runkels’ Claim ¶9 Lisa Runkel and Sylvan T. Runkel, III, held a homeowners’ policy with Owners Insurance Company. The policy ran from February 6, 2019 to February 6, 2020 and provided, in pertinent part, that it "applies to losses, bodily injury, property damage and personal injury which occur during the policy term shown in the Declarations." The policy further provided that in the case of "loss or damage by wind or hail, notice of the loss or damage must be given to us or our agency within one year after the date the loss or damage occurred." ¶10 On or about July 5, 2019, a hailstorm damaged the Runkels’ roof and other parts of their property, although they assert that they did not discover this damage until the late spring or early summer of 2020, when a contractor informed them of it. The Runkels contend that they notified Owners of the damage on or about July 7, 2020, and they filed a claim on July 15, 2020, just ten days after the expiration of the one-year notice period set forth in the policy. ¶11 Owners denied the Runkels’ claim as untimely, and the Runkels filed a declaratory judgment action in the Boulder County District Court, asking the court to conclude that (1) Colorado’s notice-prejudice rule applied to the one-year notice provision in their policy, (2) Owners suffered no prejudice as a result of the delayed notice, and (3) they were therefore entitled to coverage for their hail loss. Owners subsequently moved for summary judgment, and the district court granted that motion, concluding that the notice-prejudice rule did not apply and that the policy’s plain language required the Runkels to provide notice within one year of the damage, which the Runkels did not do. ¶12 The Runkels appealed, arguing that the district court had erred in not applying the notice-prejudice rule. Runkel, ¶ 9. In the Runkels’ view, the public policy considerations that this court identified in Clementi as supporting the application of that rule in the context of a UIM policy applied equally to first-party homeowners’ insurance policies. Id. ¶13 In a unanimous, unpublished opinion, the division affirmed. Id. at ¶¶ 1, 17. Citing the division’s opinion in Gregory, the division concluded that it would be inappropriate for it, rather than this court, to extend the notice-prejudice rule to first-party claims under homeowners’ insurance policies, and thus, it applied the traditional approach and concluded that the Runkels’ claim was untimely filed without justifiable excuse or extenuating circumstances. Id at ¶ 15. * * * * ¶14 Gregory and the Runkels filed petitions for writs of certiorari in this court, and we granted both petitions. II. Analysis ¶15 We begin by setting forth the applicable standard of review. We then discuss the development of Colorado law regarding notice provisions in insurance contracts. We end by applying the pertinent legal principles to the homeowners’ policies at issue here, concluding that the notice-prejudice rule applies to these types of policies. A. Standard of Review [1–4] ¶16 The question of whether the notice-prejudice rule should apply to a particular type of insurance policy presents a question of law that we review de novo. See Amica Life Ins. Co. v. Wertz, 2020 CO 29, ¶ 16, 462 P.3d 51, 54. We likewise review orders granting summary judgment motions de novo. Ryser v. Shelter Mut. Ins. Co., 2021 CO 11, ¶ 13, 480 P.3d 1286, 1288. When, as here, "the material facts are undisputed, summary judgment is appropriate only when the pleadings and supporting documents show that the moving party is entitled to judgment as a matter of law." Id. 480 P.3d at 1289; accord C.R.C.P. 56(c). In deciding whether to grant summary judgment, "a court must grant the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and it must resolve all doubts against the moving party." Ryser, ¶ 13, 480 P.3d at 1289. B. The Traditional Approach and the Notice-Prejudice Rule [5] ¶17 Historically, Colorado courts did not consider insurer prejudice in late-notice coverage cases. Clementi, 16 P.3d at 226. Instead, Colorado courts followed what has come to be called the "traditional approach," which is "grounded upon a strict contractual interpretation of insurance policies under which delayed notice was viewed as constituting a breach of contract, making the issue of insurer prejudice immaterial." Id. Consequently, under the traditional approach, "an unexcused delay in giving notice relieves the insurer of its obligations under an insurance policy, regardless of whether the insurer was prejudiced by the delay." Id. at 227. Such an approach has been said to further the dual public policies of (1) allowing insurers to conduct prompt investigations and adequately defend against claims and (2) protecting the insurer from potentially fraudulent claims, Id. A court may, however, excuse an insured’s late notice upon a showing of justifiable excuse or extenuating circumstances explaining the delay. Certified Indem. Co. v. Thun, 165 Colo. 354, 439 P.2d 28, 30 (1968). ¶18 Colorado courts observed the traditional rule for decades following this court’s opinion in Barclay v. London Guarantee & Accident Company, 46 Colo. 558, 105 P. 865 (1909). See also Marez v. Dairyland Ins. Co., 638 P.2d 286, 288–89 (Colo. 1981) (collecting cases and noting the traditional approach enunciated in Barclay), overruled in part by Friedland v. Travelers Indem. Co., 105 P.3d 639, 645 (Colo. 2005). ¶19 In Marez, 638 P.2d at 290, however, we considered for the first time whether to abandon the traditional approach and adopt the notice-prejudice rule in an automobile liability insurance case in which the insureds had provided no notice to their insurer of a liability claim. In those circumstances, we declined to depart from the traditional approach, stating:
To adopt a new rule in this case—where the insureds have totally failed to comply with the contract conditions—would negate the purpose of the contract conditions and render them meaningless and would in effect rewrite the insurance policy contrary to the intent of the parties as expressed by the clear, unambiguous language of the contract. Id. at 291. ¶20 We next considered whether to abandon the traditional approach in Clementi, a case involving an insured’s late notice of a UIM claim. Noting that by the time we issued our opinion in that case, few courts still strictly adhered to the traditional approach and that the "vast majority" of courts then followed the so-called "modern trend" and applied the notice-prejudice rule in UIM cases, we adopted the notice-prejudice rule in such cases. Clementi, 16 P.3d at 228, 230. In reaching this conclusion, we distinguished Marez on the ground that it was a no-notice liability case, and we concluded that Marez was inapplicable in determining whether a court should consider insurer prejudice in a late-notice UIM case. Id. at 228. ¶21 In adopting the notice-prejudice rule in the circumstances there before us, we noted three policy justifications that other state courts had articulated for departing from the traditional approach and that Colorado courts had followed, albeit in other contexts: "(1) the adhesive nature of insurance contracts, (2) the public policy objective of compensating tort victims, and (3) the inequity of the insurer receiving a windfall due to a technicality." Id. at 229–30. ¶22 We further adopted a two-step approach to analyzing late-notice coverage cases. Id. at 231. Under this approach, we said, a court must first determine whether an insured’s notice of a claim or loss was timely. Id. Such a determination should include an assessment of the timing of the notice and the reasonableness of any delay. Id. If the court finds that the notice was untimely and that the delay was unreasonable, then the court should proceed to consider whether the insurer was prejudiced by the untimely notice. Id. And because it would be difficult for the insured to prove a negative, we concluded that the insurer bears the burden of proving by a preponderance of the evidence that it was prejudiced by the delayed notice. Id. at 231–32. ¶23 Five years after we decided Clementi, we again considered the notice-prejudice rule in Friedland, 105 P.3d at 643–46, a late-notice liability case. We began by observing that in Marez, 638 P.2d at 289, we had "carefully couched our preclusion of coverage holding in that case to the absolutely no-notice circumstances." Friedland, 105 P.3d at 645. We then proceeded to observe that Clementi was a late-notice case, and we said that although it did not involve a liability policy, the grounds on which we applied the notice-prejudice rule there applied as well to liability policies. Id. Accordingly, we concluded that Clementi and not Marez provided the applicable stare decisis precedent, and we overruled Marez to the extent that its holding applied to liability policies involving late notice. Id ¶24 Having so determined, we went on to explain that the three policy concerns articulated in Clementi—the adhesive nature of insurance contracts, the public’s interest in compensating tort victims, and the inequity of allowing an insurer to receive a windfall from a technicality—apply equally to liability policies. Id. at 646. In so concluding, we opined, "[N]o aspect unique to liability insurance renders the notice-prejudice rule any less compelling than it was in the Clementi context." Id. ¶25 Most recently, we considered the reach of the notice-prejudice rule in Craft v. Philadelphia Indemnity Insurance Company, 2015 CO 11, 343 P.3d 951, and Travelers Property Casualty Company of America v. Stresscon Corporation, 2016 CO 22M, 370 P.3d 140. ¶26 In Craft, ¶ 2, 343 P.3d at 952, which involved a claims-based liability policy, we began by noting that we had applied the notice-prejudice rule to a liability policy in Friedland. We observed, however, that Friedland involved an occurrence policy, that is, "a policy that provides coverage for ‘occurrences' during a policy period, regardless of when a claim is made." Id., 343 P.3d at 952–53. We noted that we had not had occasion to address whether the notice-prejudice rule applied to claims-made policies, which cover claims brought during the policy period and reported to the insurer by a date certain. Id. at ¶¶ 2–3, 343 P.3d at 953; see also 3 Colo. Code Regs. 702-5.5-1-8, § 4(A) (2023) (defining "Claims-made coverage" as "an insurance policy that provides coverage only if a claim is made during the policy period or any applicable extended reporting period"); Insurance, Black’s Law Dictionary (11th ed. 2019) (defining "claims-made insurance" as "Insurance that indemnifies against all claims made during a specified period, regardless of when the incidents that gave rise to the claims occurred"). We ultimately held that "the notice-prejudice rule does not apply to a date-certain notice requirement in a claims-made insurance policy" because in such a policy, "the date-certain notice requirement defines the scope of coverage." Craft, ¶ 7, 343 P.3d at 953. As a result, "to excuse late notice in violation of such a requirement would rewrite a fundamental term of the insurance contract." Id. ¶27 In so stating, we reiterated that Friedland did not concern a claims-made policy, and we opined that the public policy reasons for applying the notice-prejudice rule to the policy at issue in that case did not apply to the date-certain notice requirement of a claims-made policy. Id. We further emphasized that the differences between occurrence and claims-made policies lay "at the core of [the] case" then before us, and we discussed at length the differences between occurrence policies (in which an occurrence entitles an insured to benefits under coverage that al- ready exists, timely notice is merely a condition of retaining that coverage, and the purpose of prompt notice is to allow the insurer to investigate the claim and negotiate with the third-party asserting the claim) and claims-made policies (in which a date-certain notice requirement defines the temporal boundaries of the policy’s coverage terms and in which timely notice is thus the event that triggers coverage). See id. at ¶¶ 28–32, 343 P.3d at 957–58. ¶28 Finally, in Stresscon, ¶ 2, 370 P.3d at 141, we considered whether our notice-prejudice reasoning in Friedland applied to an insured’s voluntary payments made in contravention of a no-voluntary payments clause in an insurance policy, and we concluded that it did not. In so ruling, we determined that, as we had observed in Craft, we must enforce the unambiguous terms of an insurance contract. Id. at ¶ 12, 370 P.3d at 143. ¶29 Justice Márquez, who had authored Craft, dissented, pointing out that the majority had disregarded "our own precedent recognizing that, where a provision of an insurance contract does not fundamentally define the scope of coverage, but instead protects the insurer’s opportunity to investigate and defend or settle claims, the insured’s violation of that provision should not present an absolute bar to recovery." Id. at ¶ 24, 370 P.3d at 147 (Márquez, J., dissenting) (citing Friedland, 105 P.3d at 648–49, and Clementi, 16 P.3d at 229–30). C. Application ¶30 Against this historical backdrop, we turn to the cases before us, and we conclude, for two reasons, that the notice-prejudice rule applies to the policies at issue here. ¶31 First, our case law has not turned on whether the policy at issue provides a date-certain for providing notice. Rather, as described above, our recent cases have turned principally on the core conceptual distinctions between claims-made policies and occurrence policies, Craft, ¶ 28, 343 P.3d at 957, with the notice-prejudice rule applying to the latter types of policies. [6, 7] ¶32 In a claims-made policy, timely notice is an essential term of the insurance contract because notice is required during the policy period or within a short window thereafter. Craft, ¶ 32, 343 P.3d at 958. This date-certain notice requirement defines the "temporal boundaries" of the claims-made policy’s terms, and thus, in that type of policy, timely notice of a claim is the event that triggers coverage. Id. (quoting 13 Lee R. Russ & Thomas F, Segalla, Couch on Insurance § 186:13, at 32 (3d ed. 2005 & Supp. 2014)). In an occurrence policy, by contrast, "an occurrence entitles the insured to benefits under coverage that already exists, and timely notice is merely a condition of retaining that coverage." Id. at ¶ 28, 343 P.3d at 957. ¶33 Our legislature has recognized the critical importance of this distinction, as well as the significant consequences of an untimely notice in a claims-made policy. The legislature has thus adopted detailed requirements for such policies, including specific requirements regarding notice to insureds, who stand to forfeit coverage under their claims-made policies: A claims-made policy shall not be delivered or issued for delivery to any person in this state unless: (b)(I) The policy contains clear and adequate disclosure and alerts the insured to the fact that the policy is a claims-made policy and explains the unique features distinguishing it from an occurrence policy and relating to renewal, extended reporting periods, and coverage of occurrences with long periods of exposure. § 10-4-419(2), C.R.S. (2023). [8] ¶34 The cases now before us do not involve claims-made policies. Rather, the policies at issue cover losses occurring during the policy period, and thus, by definition, such policies are occurrence policies, see Craft, ¶ 2, 343 P.3d at 952–53, notwithstanding the fact that the insurers added date-certain notice requirements to such policies. Allowing an insurer to convert an occurrence policy to a claims-made policy in this way, however, would permit the insurer to enjoy the benefits of a claims-made policy without complying with the statutorily mandated re- quirements of such a policy. Absent further legislative guidance, we cannot countenance a forfeiture of coverage that occurs despite an insurer’s failure to provide the statutory protections afforded by our legislature. Accordingly, we adhere to our now-settled precedent that in an occurrence policy, the purpose of notice is simply to allow the insurer to investigate, to attempt to resolve the claim, and to defend against it, and thus, in this context, the timeliness of notice is not a fundamental contract term that is a condition precedent to coverage itself. See Craft, ¶ 32, 343 P.3d at 958; Clementi, 16 P.3d at 227. ¶35 Second, in our view, the three policy reasons supporting the application of the notice-prejudice rule that we identified in Clementi, 16 P.3d at 229, apply with equal force here. ¶36 Regarding the adhesive nature of insurance contracts, id., we noted in Friedland, 105 P.3d at 646, that insurance contracts are unlike ordinary bilateral contracts. The insurer usually presents the insured with a form contract drafted by the insurer, and the insured has little bargaining power in deciding whether to enter into the contract. Id. This is true in the context of the homeowners’ insurance policies at issue here, as well. ¶37 Regarding the public policy objective of compensating tort victims, Clementi, 16 P.3d at 229, we acknowledge that neither Gregory nor the Runkels are tort victims per se. They did, however, obtain homeowners’ insurance, in part, to protect themselves financially in the event of property damage to their homes. Moreover, just as tort victims are usually not at fault (or at least not predominantly at fault) for the torts committed against them, homeowners are often not at fault for damage to their homes, including, as was the case here, hail damage to their roofs. As a result, in our view, the policy reasons for compensating tort victims apply equally here. Those who obtain homeowners’ insurance to cover the cost to repair unforeseen damage to their homes, typically for which the insureds bear no fault, should be compensated according to that insurance coverage. ¶38 Lastly, regarding the inequity of allowing insurers to receive a windfall due to a technicality, id., Gregory and the Runkels paid premiums to obtain homeowners’ insurance coverage, just as the insureds did with their respective UIM and liability policies in Clementi, 16 P.3d at 230, and Friedland, 105 P.3d at 646. Moreover, allowing the insurers in the instant cases to declare a forfeiture of coverage would afford them the same windfall as the insurers would have received in Clementi, 16 P.3d at 230, and Friedland, 105 P.3d at 646, namely, the ability to rely on a technicality to avoid their obligation to pay legitimate claims for which the insureds purchased coverage and paid all of their premiums. As in Clementi and Friedland, we decline to condone such a forfeiture here. Friedland, 105 P.3d at 646; Clementi, 16 P.3d at 230. [9, 10] ¶39 Accordingly, we conclude that the notice-prejudice rule applies to first-party, occurrence-based homeowners’ insurance policies. As a result, we further conclude that courts in cases involving such policies must follow the two-step approach that we described in Clementi, 16 P.3d at 231. Thus, a court must first determine whether an insured’s notice was timely or whether any delay was reasonable. Id. If the court determines that the notice was timely or that any delay was reasonable, then the analysis ends there, and the court should conclude that coverage exists. If, however, a court determines that an insured’s notice was untimely and that the delay was unreasonable, then the court moves to step two, which requires the court to determine whether the insurer was prejudiced by such untimely notice. Id. Because it is more difficult for the insured to prove a lack of prejudice, the insurer bears the burden of proving such prejudice by a preponderance of the evidence. Id. at 231–32. ¶40 We are not persuaded otherwise by Safeco’s argument in Gregory that the policy in that case is nearly identical to the policy in Craft. The policy in Craft was a claims-made policy with a date-certain notice requirement. Both Gregory’s and the Runkels’ policies, in contrast, were occurrence policies, and as we noted in Craft, ¶ 28, 343 P.3d at 957, the differences between the two types of policies lay at the core of determining whether the notice-prejudice rule should apply. The rule did not apply in Craft because in a claims-made policy, a date-certain notice requirement is a material term that is to be strictly enforced. The same principle does not apply in the context of occurrence policies. ¶41 Relating to this last point, we disagree with the contention that the notice deadlines of the occurrence policies at issue here were fundamental terms of those insurance contracts. Merely saying this is so does not make it so. Moreover, so concluding effectively converts the policies at issue to claims-made policies, notwithstanding the insurers’ failure to comply with any of the statutory requirements for such policies, including the requirements that a claims-made policy (1) "contain[ ] clear and adequate disclosure and alert[ ] the insured to the fact that the policy is a claims-made policy" and (2) "explain[ ] the unique features distinguishing it from an occurrence policy." § 10-4-419(2)(b)(I). ¶42 We likewise are unconvinced by Safe-co’s and Owners’ argument that property coverage policies are completely different from claims-made or occurrence policies, which the insurers assert concern only liability coverage. The cases now before us involve homeowners’ policies that cover both liability and property damage claims. We perceive no basis for saying that such policies are occurrence policies to the extent that they cover liability claims but not occurrence policies to the extent that they cover property damage claims. Nor do we perceive a basis for asserting that the notice-prejudice rule would apply to liability claims under those policies but not to property damage claims under the very same policies. Moreover, although the insurers contend that the homeowners here are not tort victims and thus, the notice-prejudice rule’s policy consideration of compensating tort victims is not satisfied in either of the cases before us, we disagree. Specifically, for the reasons discussed above, we conclude that the insureds here are in essentially the same position as tort victims, given that they experienced losses through no fault of their own and they had purchased insurance to protect themselves from such losses. Accordingly, we deem it appropriate to treat the homeowners in these cases like the tort victims in our prior notice-prejudice rule cases. [11, 12] ¶43 We further reject Safeco’s and Owners’ contention that the principle of stare decisis requires us to continue to apply the traditional approach, rather than the notice-prejudice rule, when considering late-notice cases in the context of insurance policies. Stare decisis is a judicially created doctrine under which courts follow preexisting rules of law. Love v. Klosky, 2018 CO 20, ¶ 14, 413 P.3d 1267, 1270. This doctrine "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Id. (quoting Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). As a result, we are reluctant to depart from settled law. Id. [13, 14] ¶44 Courts may depart from a prior ruling or overrule it, however, when sound reasons exist to do so. Id. at ¶ 15, 413 P.3d at 1270. Specifically, "[w]e will depart from our existing law only if we are clearly convinced that (1) the rule was originally erroneous or is no longer sound because of changing conditions and (2) more good than harm will come from departing from precedent." Id. ¶45 Here, applying the notice-prejudice rule does not effect a departure from precedent but simply applies the principles established in Clementi and Friedland to a different factual context. No prior precedent has mandated the application of the traditional rule in cases like those now before us. To the contrary, these cases involve a question of first impression, and thus, they do not implicate stare decisis concerns. ¶46 Finally, we disagree with Safeco’s and Owners’ assertion that applying the notice-prejudice rule in these cases improperly places on the insurer the burden of proving prejudice. As we said in Clementi, 16 P.3d at 231–32, placing the burden on the insured would require the insured to prove a negative, namely, that the insurer suffered no prejudice. For the same reasons that we articulated in Clementi, we conclude that the burden of proving prejudice is more appropriately borne by the insurers. See id. III. Conclusion ¶47 For these reasons, we conclude that the notice-prejudice rule applies to occurrence-based, first-party homeowners’ property insurance policies like those at issue here. ¶48 Accordingly, we reverse the judgments of the divisions below in Gregory and Runkel and remand both cases to the divisions with instructions that the cases be returned to the respective district courts for further proceedings consistent with this opinion. Specifically, in Gregory, Safeco must be given an opportunity to seek to establish prejudice from the late notice provided by Gregory. In Runkel, the district court must first determine whether the Runkels’ late notice was unreasonable. If it was, then Owners must be given an opportunity to seek to establish prejudice from any such late notice. JUSTICE HART, joined by CHIEF JUSTICE BOATRIGHT and JUSTICE MÁRQUEZ, dissented. JUSTICE HART, joined by CHIEF JUSTICE BOATRIGHT and JUSTICE MÁRQUEZ, dissenting. ¶49 I cannot sign on to the majority’s extension of the notice-prejudice rule to first-party homeowners’ property claims. As I explain here, it rests on a misunderstanding of the insurance market. Making law based on that misunderstanding is likely to have consequences we cannot fully appreciate today. Moreover, the majority establishes a new, ill-defined "public policy" justification for ignoring our state’s long-standing commitment to freedom of contract. I see no limiting principle that will restrain the reach of this opinion; its reasoning seems to apply to nearly all insurance policy disputes involving late notice. For these reasons, I respectfully dissent. * * * ¶50 For nearly a century, following this court’s decision in Barclay v. London Guarantee & Accident Co., 46 Colo. 558, 105 P. 865 (1909), Colorado courts followed the "traditional approach" in assessing the impact of late notice on insurance claims. Under this approach, which is "grounded upon a strict contractual interpretation of insurance policies," "an unexcused delay in giving notice relieves the insurer of its obligations under an insurance policy, regardless of whether the insurer was prejudiced by the delay." Clementi v. Nationwide Mut. Fire Ins. Co., 16 P.3d 223, 226, 227 (Colo. 2001); see also Marez v. Dairyland Ins. Co., 638 P.2d 286, 288–89 (Colo. 1981) (collecting cases and noting the traditional approach applied in Barclay), overruled in part by Friedland v. Travelers Indem. Co., 105 P.3d 639, 645 (Colo. 2005). Of course, even under this approach, a court can excuse an insured’s late notice if the insured shows a justifiable excuse or extenuating circumstance explaining the delay. See Certified Indem. Co. v. Thun, 165 Colo. 354, 439 P.2d 28, 30 (1968). ¶51 The traditional approach recognizes Colorado’s "strong commitment to the freedom of contract." Bailey v. Lincoln Gen. Ins. Co., 255 P.3d 1039, 1047 (Colo. 2011); see also City & Cnty. of Denver v. Dist. Ct., 939 P.2d 1353, 1361 (Colo. 1997) ("The right of parties to contract freely is well developed in our jurisprudence."). And we have observed that "[t]he freedom to contract is especially important in the insurance industry, as insurance policy terms are the primary means by which parties distribute and shift risk." Bailey, 255 P.3d at 1047; see also Craft v Phila. Indem. Ins. Co., 2015 CO 11, ¶ 35, 343 P.3d 951, 959 (2015) ("As we recognized in Bailey, the freedom to contract is especially important in the insurance industry, where the terms of the policy distribute risk and thus define the very product that is bargained for."). This was, and still is, a baseline principle—courts in Colorado honor the terms of a contract absent some compelling reason to do otherwise. ¶52 In 2001, for the first time, we made a limited departure from this traditional approach to late notice, applying the notice-prejudice rule in the context of an uninsured motorist ("UIM") claim. Clementi, 16 P.3d at 232. We observed that other courts taking the same tack had "articulated three policy justifications" for doing so: "(1) the adhesive nature of insurance contracts, (2) the public policy objective of compensating tort victims, and (3) the inequity of the insurer receiving a windfall due to a technicality." Id at 229. We accepted these justifications as sufficient to override the traditional approach and adopt the notice-prejudice rule in the context of UIM policies in Colorado, particularly emphasizing the legislature’s several clear statements in support of a public policy to make tort victims whole. See id. at 229–30. ¶53 A few years later, in Friedland, we extended application of the notice-prejudice rule beyond UIM policies and held that it applied to all liability policies. See 105 P.3d at 646. We observed that "liability coverage is for the protection of the insured against liability to a third party and for the protection of the innocent tort victim who suffers personal injury or property damage for which the insured is liable." Id. And we emphasized once again that Colorado recognizes "a strong public policy in favor of protecting tort victims." Id ¶54 Other than these two liability cases, both involving tort victims, we have consistently adhered to the traditional approach, with its focus on the public policy of enforcing contracts—including insurance contracts—as entered by the parties. ¶55 The majority today extends application of the notice-prejudice rule to first-party homeowners’ property insurance claims. In so doing, the majority creates a new, exceedingly abstract "public policy" that it concludes should override Colorado’s long-standing protection of the freedom to contract. I fear this, together with the majority’s limited understanding of the insurance industry, will have far-reaching consequences on the availability and cost of insurance in our state. ¶56 My concerns are two-fold. First, the majority’s characterization of the policies in these cases reflects a misunderstanding of how insurance operates "on the ground." Second, I object to what I perceive as the majority expanding our precedent in this area beyond recognition and without clear limiting principles. ¶57 The majority characterizes the homeowners’ policies here as Occurrence-based, first-party homeowners’ property insurance policies" and distinguishes them throughout from "claims-made policies." Maj. op. ¶ 1 (emphasis added). However, the Colorado Division of Insurance defines "occurrence coverage" as "an insurance policy that provides liability coverage only for injury or damage that occurs during the policy term, regardless of when the claim is actually made." 3 Colo. Code Regs. 702-5:5-1-8 (2023) (emphasis added). Similarly, section 10-4-419(5), C.R.S. (2023), defines a claims-made policy as "a policy of liability insurance." See also Craft, ¶ 28, 343 P.3d at 957 ("The conceptual differences between occurrence and claims-made liability policies lie at the core of this case." (emphasis added)). In other contexts, both occurrence and claims-made coverage have been described as the "standard" for liability insurance. See, e.g., 8 John W. Grund et al, West's Colorado Practice Series, Personal Injury Practice-Torts and Insurance § 53:12 (3d ed. 2023). Moreover, Black's Law Dictionary defines "liability insurance" as "[a]n agreement to cover a loss resulting from the insured’s liability to a third party …. The insured’s claim under the policy arises once the insured’s liability to a third party has been asserted." Insurance, Black’s Law Dictionary (11th ed. 2019). ¶58 A first-party property policy is not liability insurance. Instead, it is "insurance that protects the insured against its own actual losses and expenses." Brief for Complex Insurance Claims Litigation Association & American Property Casualty Insurance Association as Amicus Curiae Supporting Respondent, Gregory v. Safeco Ins. Co. of Am., No. 22SC399 (May 22, 2023) 2023 WL 8019245. A date-certain notice requirement in a property policy serves a different purpose than a notice provision in a liability policy. Date-certain notice in a property policy assists the insurance company in underwriting and pricing the policy. It is a fundamental term of the contract between the insured and the insurer. ¶59 The contract between Gregory and Safeco illustrates the difference between notice in a liability policy and notice in a first-party property policy. Gregory’s contract includes both types of coverage, but they are separated into distinct sections with distinct terms. The date-certain provision requiring notice within 365 days for wind or hail damage is included only as a property condition. Notice in the context of the liability coverage must be given "as soon as practicable."1a ¶60 While this distinction between first-party property policies and liability policies was mentioned in the briefing, it was not emphasized. It did, however, arise during oral arguments in Gregory, when counsel for Safeco responded to a question by saying, "we disagree that this is an occurrence-based policy. It’s very clear from the regulations cited in the briefs that occurrence-based policies are liability only. Property coverage doesn’t fall into this framework of occurrence-versus claims-made. It is its own animal." ¶61 The differences between property and liability policies are central to the issue we confront in these cases and yet the majority gives those differences short shrift. I cannot predict the ripple effects this will have, but I fear they will be significant. ¶62 I am also troubled by the majority’s application of Clementi to the policies at issue here. Consider Clementi’s three factors: contract of adhesion, tort victim, inequity of a windfall based on a technicality. ¶63 Of course, I agree that these homeowners’ policies are contracts of adhesion. Most insurance policies are. ¶64 The majority’s analysis of the second Clementi factor, however, takes a leap from its origins in a long-established public policy—the protection of tort victims—to an undefined and unlimited policy in favor of the protection of individuals who the court believes deserve it. The majority acknowledges that the insureds here are not tort victims—or not "tort victims ‘per se.’ " Maj. op. ¶ 37. But it concludes that it is not fair to deny them coverage because they paid on their policies and have been damaged, in the view of the majority, through no fault of their own. "As a result," the majority concludes, "the policy reasons for compensating tort victims apply equally here." Id. ¶65 The majority’s equation of these property owners with tort victims in liability cases stems from its misunderstanding of the insurance policies at issue here. Certainly, the hail damage impacted Gregory and the Runkels through no fault of their own. But their property policies placed on them an obligation to be aware of the condition of their property and to make claims for coverage of that damage within 365 days. Unlike the tort victims in liability cases, property owners are the individuals best positioned to make a claim within a reasonable time. Policy concerns in this context favor our long-standing commitment to enforcing contracts, not the creation of an exception to that rule. ¶66 The same is true when considering the third Clementi factor. The majority concludes that enforcing the terms of the contracts that Gregory and the Runkels entered into would give the insurer a windfall because the insureds have been paying on their policies and the date-certain notice provision is simply a technicality that can be ignored in these circumstances. Maj. op. ¶ 38. But the date-certain notice provision limiting coverage for hail damage to claims reported within 365 days is not a technicality. Indeed, if this policy-defining date can be treated as a technicality, I fear that no insurance policy could be enforced as written in Colorado—or at least that insurers will have to worry about that possibility. In all late-notice disputes, it will be the case that the insured paid premiums for a covered loss and the insurance company now says it will not cover that loss because it did not receive notice within the time specifically prescribed in the contract. While notice may be a technicality in some contexts, in many cases a date-certain notice provision may be central to the terms the insurance company is willing to offer. That seems most likely to be the case here—hail coverage was priced with an understanding that the insurer’s liability for damage would end 365 days after the hail event if no claim was made on the policy. The certainty of that end date allows insurance companies to price insurance and makes that end date an essential term in each first-party property policy. ¶67 After today’s decision, I worry that every late-notice dispute will end up in court because there is always a chance that a court will characterize the notice provision as a technicality. ¶68 Unlike Clementi, which was limited to UIM policies, and Friedland, which was limited to liability policies and specifically tied to the policy of protecting tort victims, this decision provides no limiting principles and risks destabilizing Colorado insurance markets. Because the majority’s opinion expands our precedent to a seemingly unlimited degree, I respectfully dissent.
1In Gregoryv.Safeco Insurance Company of America, No. 22SC399, we granted certiorari to decide:
Whether the notice-prejudice rule applies to homeowner's property and casualty insurance policies.
In Runkel v. Owners Insurance Company, No 22SC563, we granted certiorari to decide:
Whether the notice-prejudice rule applies to homeowner’s property insurance policies.
1aThis policy language is similar or identical to the language used m the liability notice provisions at issue in Clementi and Friedland, and the notice serves the same purpose—to give the insurance company an opportunity to "investigate or defend the insured's claim and to receive the insured's cooperation in the process of gathering information, negotiating settlements, securing and giving evidence, attending hearings and trials, and assisting witnesses to attend hearings and trials." Friedland, 105 P 3d at 643–44; Clementi, 16 P.3d at 232