**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**December 23, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

CURTIS PARK GROUP, LLC,

    Plaintiff - Appellee,

v.

ALLIED WORLD SPECIALTY
INSURANCE COMPANY,

    Defendant - Appellant.

_____

AMERICAN PROPERTY CASUALTY
INSURANCE ASSOCIATION,

    Amicus Curiae.

No. 23-1307

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-00552-CNS-NRN)**
_____

Frederick R. Yarger, (Carolyn J. Fairless, and William P. Sowers, Jr., with him on the briefs), Wheeler Trigg O'Donnell LLP, Denver, Colorado, for Defendant-Appellant.

Andrew W. Guthrie (Ernest Martin, Jr., with him on the brief), Haynes and Boone, LLP, Dallas, Texas, for Plaintiff-Appellee.

Kendra N. Beckwith and Brian J. Spano, Lewis Roca Rothgerber Christie LLP, Denver, Colorado, filed a brief for Amicus Curiae American Property Casualty Insurance Association in support of Defendant-Appellant.

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Allied World Specialty Insurance Company (Allied World) appeals the jury's verdict in favor of its insured, Curtis Park Group, LLC (Curtis Park). Allied World argues that the district court erred in interpreting Curtis Park's builder's risk insurance policy to allow Curtis Park to recover repair costs it had not paid and had no obligation to pay. We agree. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the jury's verdict and remand for a new trial with instructions that Curtis Park cannot recover the costs of repair.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    *The Construction of S\*Park*

This dispute arose when Curtis Park, a subsidiary of a Colorado-based real-estate developer, encountered a major problem during the construction of a new development called "S\*Park." S\*Park was to include five commercial and residential buildings, four of which were to be supported by a single concrete slab. Below-grade parking was to be located beneath the slab.

Curtis Park hired MW Residential LLC (Milender White) as the general contractor to construct S\*Park in accordance with the designs Curtis Park provided. Curtis Park and Milender White agreed that Milender White would front the initial construction costs, as well as potential repair costs. They also agreed that Curtis Park

had the right not to reimburse Milender White for the cost of repairing defective work that arose from Milender White's negligence or failure to fulfill its contractual responsibilities.

Construction on S*Park began in September 2016. Milender White subcontracted with All Phase Concrete (All Phase) to construct the concrete slab. All Phase in turn subcontracted with Harris Rebar to install the rebar within the concrete slab. Harris Rebar tied the rebar and put it in place. All Phase then poured the concrete around the rebar.

### 2.    *The Slab Deflection*

In December 2017 Curtis Park discovered excessive deflection in the concrete slab. In lay terms, the slab was sagging. Curtis Park engaged a consultant, J.R. Harris & Company Structural Engineers (J.R. Harris), to determine why the slab was deflecting and how the problem could be fixed. J.R. Harris concluded that the slab deflected because (1) it was thicker over the columns and thinner at the center of the bays, (2) the top layer of rebar was placed lower than designed, and (3) the slab was thinner than designed.

Upon receiving J.R. Harris's report, Curtis Park told Milender White it was rejecting the slab "[a]s a result of the deficiencies in the work and the nonconformity to the contract documents." Aplt. App., Vol. XVIII at 103. Repairing the slab cost $2,857,157.78. Milender White was obligated to front the costs of repair per its contract with Curtis Park. Milender White in turn withheld payment from its concrete

Page 3

subcontractor, All Phase. All Phase sued Milender White for the withheld payments, and the parties ultimately settled.

### 3.    *The Policy*

Curtis Park insured itself during the construction process with a builder's risk insurance policy from Allied World (the Policy). Builder's risk insurance is "intended to cover the interests of all parties involved in the construction process to the extent they are listed as insureds under the policy." Douglas L. Patin, *Law and Practice of Insurance Coverage Litigation* § 45:25 (July 2024 Update). Five features of the Policy are particularly relevant to this litigation.

First, the Policy covers "direct physical loss or damage caused by a covered peril to 'buildings or structures' while in the course of construction, erection, or fabrication." Aplt. App., Vol. XIV at 146.

Second, Curtis Park is the only entity listed in the Policy as a "named insured." The Policy does not "cover more than 'your' insurable interest in any property." *Id.* at 161. It defines "you" and "your" as "the persons or organizations named as the insured on the declarations." *Id.* at 146. Also, "[i]nsurance under this coverage will not directly or indirectly benefit anyone having custody of [the named insured's] property." *Id.* at 163. Thus, the Policy limits the benefits of insurance to the named insured. Curtis Park did not include Milender White or the subcontractors as "named insureds."

Third, the "value of covered property" is "based on [the] replacement cost" of that property. *Id.* at 160. The replacement cost includes "the necessary and

reasonable costs of materials and labor incurred to repair or replace . . . the part of the covered property that sustains direct physical loss or damage." *Id.* Payment for the cost of repair is limited: "If the part of the covered property that sustains direct physical loss or damage is repaired or replaced, *the payment will not exceed the amount [the named insured] spend[s] to repair or replace the damaged or destroyed property*." *Id.* at 160 (emphasis added).

Fourth, the Policy excludes coverage for "loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to . . . design, specifications, construction, materials, or workmanship," but it does cover "damage caused by" "an act, defect, error, or omission" that "results in a covered peril." *Id.* at 157.

Finally, coverage is void if the named insured "willfully conceal[s] or misrepresent[s] . . . a material fact or circumstance that relates to this insurance or the subject thereof; or . . . [the named insured's] interest herein." *Id.* at 163. Similarly, the named insured may not recover if "[t]here has been fraud or false swearing by [the named insured] . . . with regard to a matter that relates to this insurance or the subject thereof." *Id.* at 163.

### 4.    *The Claim*

In March 2018 Curtis Park gave notice to Allied World of a claim for the cost of repairing the deflecting slab. Curtis Park sought $2,857,157.78 million in *hard costs*—the cost of repairing the slab—and $986,391.59 in *soft cost*s—the cost

incurred because of the delay in construction. Curtis Park did not disclose the J.R. Harris Report to Allied World when it filed the claim.

In August 2019, after conducting its own investigation, Allied World denied coverage because it determined that the deflection was caused by a construction defect and was therefore not covered under the Policy. It concluded that the rebar was "located too low within the concrete slab causing excessive downward deflection," and that "[t]he concrete thickness of the slab varied across the area of the slab and in multiple locations was thinner than specified by the structural designer." *Id.* at 17.

That December Curtis Park and Milender White entered into a project close-out agreement (the Close-Out Agreement). They agreed to work together to pursue a claim against Allied World under Curtis Park's insurance policy. Curtis Park and Milender White would "share equally the reasonable costs and fees incurred" and—if they succeeded—would split the net litigation proceeds 62.2% to Milender White and 37.8% to Curtis Park "regardless of whether or how the proceeds are applied to the Insurance Claim by [Allied World]." Aplt. App., Vol. XVIII at 121–22. The parties also agreed that even if the lawsuit was unsuccessful, Curtis Park *would not have to reimburse* Milender White for the hard costs of repairing the deflecting slab. All Phase and Milender White later entered into a confidential settlement agreement giving All Phase a right to a portion of the proceeds from the lawsuit against Allied World.

### B.    Procedural History

In January 2020—one month after it entered into the Close-Out Agreement with Milender White—Curtis Park sued Allied World for breach of contract, common-law bad faith, and statutory bad faith. After discovery began, Allied World obtained a copy of the J.R. Harris Report on the cause of the slab's deflection via a third-party subpoena. Allied World also learned during discovery that Curtis Park had chosen not to disclose the J.R. Harris Report when it initially submitted its claim. In light of this new information, Allied World amended its denial of Curtis Park's claim, adding that it was also rejecting the claim because Curtis Park violated the Policy's prohibition on willful misrepresentation.

Allied World later discovered through a motion to compel that Curtis Park had entered into the Close-Out Agreement with Milender White before filing suit. Allied World then reopened its deposition of Curtis Park under Fed. R. Civ. P. 30(b)(6) and elicited that Curtis Park "will not pay Milend[e]r White anything" if Curtis Park does not prevail in court against Allied World. *Id.*, Vol. I at 229–30.

After learning that Curtis Park had not paid and will not ever pay the hard costs of the repair, Allied World filed a motion in limine to exclude from trial any evidence of the hard-costs portion of Curtis Park's claim. The district court denied the motion. Later, in disposing of a disagreement between the parties over jury instructions, the court ruled that it did not matter "that [Milender White] did the repairs on their own and have agreed to waive costs." *Id.*, Vol. VI at 192. Proceeding from this ruling, the court excluded the Close-Out Agreement from evidence as

confusing and prejudicial under Fed. R. Evid. 403, although the court summarized parts of it for the jury in its instructions. During trial the court ruled as a matter of law that Curtis Park was not "precluded from seeking coverage under the policy for the hard costs that Milender White absorbed." *Id.*, Vol. VIII at 145. The court later extended this ruling to the subcontractors, holding that even if the subcontractors bore the cost of the repair, Curtis Park could recover under the Policy.

The district court further relied on its ruling in instructing the jury. The court gave a mid-trial instruction that "Milender White's payment of [the roughly $2.8 million in hard] costs does not preclude Curtis Park from seeking coverage under the policy for reimbursement of these costs." *Id.* at 161. The court repeated this statement in the post-evidence jury instructions.

The jury found in favor of Curtis Park on its breach-of-contract and statutory bad-faith claims, but not on its common-law bad-faith claim. Allied World filed a motion for new trial and renewed a prior motion for judgment as a matter of law. The court denied both motions.

## II.    DISCUSSION

### A.    Standard of Review

"When the facts are undisputed, this Court reviews the district court's interpretation of an insurance contract de novo." *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Co.*, 286 F.3d 1216, 1218 (10th Cir. 2002). The parties agree that Colorado law governs the construction of the Policy, so "we proceed from the same

assumption." *Union Standard Ins. Co. v. Hobbs Rental Corp.*, 566 F.3d 950, 952

(10th Cir. 2009) (adopting the parties' shared view of the governing law).

## B.    Principles of Contract Interpretation

Colorado courts apply traditional principles of contract interpretation to insurance

policies. *See Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo.

2003). Each word in an insurance policy should generally be given its ordinary meaning.

*See BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1176

(10th Cir. 2021) (applying Colorado law). And "[c]ourts should read the provisions of

the policy as a whole, rather than reading them in isolation." *Cyprus Amax*, 74 P.3d

at 299. Attention to the language of the policy reflects and furthers Colorado's "strong

commitment to the freedom of contract." *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d

1039, 1047 (Colo. 2011). This freedom "is especially important in the insurance

industry, as insurance policy terms are the primary means by which parties distribute

and shift risk." *Id.* at 1047; *cf. SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,

823 F. App'x 559, 566 (10th Cir. 2020) ("Under Colorado law, sophisticated parties

allocate risk for themselves."). Indeed, "[t]he ability for insurers to limit coverage in

this manner is central to the notion of what constitutes insurance." *Bailey*, 255 P.3d

at 1047 (internal quotation marks omitted). Thus, "[i]f . . . the provisions of an

insurance policy are in plain and unambiguous language and do not violate public

policy, we will not relieve a party to the contract from disadvantageous terms or give

the language a forced construction." *Terranova v. State Farm Mut. Auto. Ins. Co.*,

800 P.2d 58, 61 (Colo. 1990) (internal quotation marks omitted).

At the same time, however, Colorado adheres to the doctrine of reasonable expectations: Insurance contracts should be read "to ensure that the reasonable expectations of an ordinary individual purchasing the [insurance] contract will be fulfilled." *Bailey*, 255 P.3d at 1051 (internal quotation marks omitted).

We also note that when interpreting insurance policies, courts must keep in mind generally accepted principles of insurance law—to be addressed in more detail later—that distinguish insurance contracts from gambling agreements and limit moral hazard.

### C.    The Policy Does Not Provide Coverage

Applying these principles, we conclude that the text of the Policy makes clear that Curtis Park cannot recover for another party's losses and must suffer an actual loss to receive coverage.

Curtis Park and the district court have read the Policy too broadly. They claim that "the [P]olicy does not preclude Curtis Park from seeking coverage . . . for the hard costs that Milender White has absorbed or agreed to pay." Aplt. App., Vol. VIII at 147. In their view, "as long as the costs were incurred . . . to repair Curtis Park's property, [Curtis Park is] covered" under the Policy regardless of "*who* . . . incur[s] the costs." Aplee. Br. at 25.

To be sure, Curtis Park correctly states that the Policy insures against "direct physical loss or damage [to S*Park] caused by a covered peril." *Id.* at 20. And setting aside the Policy's defective-construction exclusion, the slab's deflection is "direct physical loss or damage" of a type that *could* be covered under the Policy. Aplt. App., Vol. XIV at 155. But other provisions of the Policy make clear that Curtis Park can

recover only for its own injuries. That costs were incurred to repair Curtis Park's property is a *necessary* condition for coverage under the Policy, but it is not a *sufficient* one. Curtis Park must also demonstrate that, as the named insured, it was responsible for paying for those costs. Milender White and the subcontractors cannot enjoy the benefits of a Policy in which they are not named.

This second condition of coverage—that Curtis Park *actually suffer a loss* as a result of the damage to S*Park—appears throughout the Policy. To begin with, Curtis Park is the only named insured, and the Policy states that it does not cover more than the name insured's "insurable interest in any property." *Id.* at 161. In addition, the Policy expressly prohibits benefits to unnamed parties. Paragraph 2 of the "Other Conditions" section states: "Insurance under this coverage will not directly or indirectly benefit anyone having custody of [the named insured's] property." *Id.* at 162–63. This provision is unambiguous. Milender White— presumably a custodian of S*Park during construction—cannot reap the benefits of the Policy, even indirectly. If a contractor could benefit from the Policy so long as S*Park suffered direct physical loss, this language would be a nullity. *See Fire Ins. Exch. v. Sullivan,* 224 P.3d 348, 351 (Colo. App. 2009) ("[W]e construe the policy so that all provisions are harmonious and none is rendered meaningless."). Curtis Park cannot be permitted to "reap [a] windfall" by atextually "extending [Curtis Park's] coverage without compensating the insurer." *Craft v. Phila. Indem. Ins. Co.*, 343 P.3d 951, 961 (Colo. 2015) (internal quotation marks omitted) (requiring strict enforcement of the terms of an insurance policy

because to hold otherwise would "essentially rewrite[] the insurance contract and effectively create[] coverage where none previously existed").

Other provisions of the Policy reinforce our conclusion that Curtis Park must suffer actual loss to receive coverage. Most notably, the Policy explicitly limits recovery to the amount Curtis Park *actually spent* to repair the deflecting slab. After a covered event occurs, the payment owed to the insured is calculated based on the "Valuation" section of the Policy. Aplt. App., Vol. XIV at 160. The "value of covered property" is measured using replacement cost. *Id. Replacement Cost* is defined to include "the necessary and reasonable costs of materials and labor incurred to repair or replace . . . the part of the covered property that sustains direct physical loss or damage." *Id.* The hard costs of repairing the slab would be considered a replacement cost.

But clause 1(c) in the Valuation section of the Policy, the "Payment Limitation" provision, limits recovery to a certain *kind* of replacement cost:

> If the part of the covered property that sustains direct physical loss or damage is repaired or replaced, the payment will not *exceed the amount [the named insured] spend[s] to repair or replace the damaged or destroyed property*.

*Id.* (emphasis added). The clause—by its plain terms—limits what the named insured will be paid under the Policy to what the named insured *actually spends* to repair the covered property. If the named insured does not spend anything to repair the damaged property, it cannot recover. Curtis Park, by its own admission, "will not pay Milend[e]r White anything" for the repairs. Aplt. App., Vol. I at 229–30. Curtis Park's replacement cost is therefore zero. It cannot recover costs it need not pay for. Where, as here, "a contractual

provision is clear and unambiguous," we "should not rewrite it to arrive at a strained construction." *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).

Our interpretation of the Policy also clearly aligns with the reasonable expectations of the parties. As previously noted, the Colorado Supreme Court requires that the text of insurance contracts be read and interpreted "to ensure that the reasonable expectations of an ordinary individual purchasing the contract will be fulfilled." *Bailey*, 255 P.3d at 1051 (internal quotation marks omitted). "[I]nformed insurance-market participants conduct their business in light of custom, practice, and usage in the insurance market and in the trade or business being insured." Restatement of the Law of Liability Insurance § 3 cmt. c (Am. Law. Inst. 2019). We can therefore look to industry practice to determine how an ordinary purchaser of builder's risk insurance would expect the Policy to operate. *See First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 167 (2d Cir. 1998) ("When interpreting terms in insurance policies, we are to construe the language at issue . . . by examining the reasonable expectation and purpose of the ordinary business person when making an ordinary business contract." (brackets and internal quotation marks omitted)). The ordinary business person purchasing "a builder's risk policy will typically be either the owner or general contractor." Michael A. Stover, *A Guide to Builder's Risk Insurance*, 53.3 Tort Trial & Ins. Prac. L. J., 819, 824 (Spring/Summer 2018) (Stover). The relevant literature is unambiguous about the reasonable expectations of owners and general contractors who obtain builder's risk insurance: "[I]ndustry publications have unanimously agreed that contractors, subcontractors, suppliers, and materialmen should be added [to builder's

risk insurance policies] as named insureds." Mark M. Bell, Christopher S. Dunn & James H. Costner, *Confronting Conventional Wisdom on Builders Risk: From Named-Insured Status to Concurrent Causation*, 31 Constr. Law. 15, 16 (Fall 2011).[1] Why would it be industry practice to include contractors as named insureds if—as Curtis Park argues—the owner, as named insured, could recover for their losses regardless? Without doubt, a typical buyer of a builder's risk policy would not expect the losses of contractors and subcontractors to be covered if those parties were not named as insureds in the policy.

Curtis Park attempts to circumvent the clear text of the Policy by misreading case law. It points to the Colorado Supreme Court's statement that "[b]uilder's risk policies typically indemnify a contractor against the loss of, or damage to, a building the contractor is constructing." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 694 n.7 (Colo. 2009) (citing Lee R. Russ and Thomas F. Segalla, *Couch on Insurance* § 1:53

---

[1] *See* Stover, *supra*, 825 ("It is in the best interests of the policyholder to name as many potential insureds as possible in the builder's risk policy to avoid any coverage or subrogation gaps . . . ."); Patrick J. Wielinski, W. Jeffrey Woodward & Jack P. Gibson, *Contractual Risk Transfer: Strategies for Contract Indemnity and Insurance Provisions,* Int'l Risk Mgmt. Inst., Inc., iv, XVII.K.3 (Dec. six 2010) ("All contractors and subcontractors, as well as the project owner, should be named as insureds under the [builder's risk] policy."); Steven A. Coombs & Donald S. Malecki, *The Builders Risk Book* 84 (2010) ("Named insured status is recommended for the owner, contractors, and subcontractors even when the construction contract allows for or calls for some other, lesser type of protection for the parties."); Patrick J. O'Connor, Jr., *How to Draft a Construction Contract Insurance Provision*, 8 No. 1 J. of the Am. Coll. of Constr. Laws. 4, 6 (Feb. 2014) ("The policy should name the owner and all contractors and subcontractors of every tier as insureds . . . ."); Stephen D. Palley et al., *Construction Insurance: A Guide for Attorneys and Other Professionals* 24 (2011) ("Under builders risk policies," additional-insured status "is often given to contractors and subcontractors of every tier.").

(3d ed. 1997)). Curtis Park claims that the quoted language establishes that a contractor can recover under a builder's risk policy even if it is not named as an insured in the policy. We disagree. *Copper Mountain* merely observes that builder's risk policies ordinarily indemnify contractors because they are the party most likely to purchase builder's risk insurance. *See* John V. Garaffa & Heidi Hudson Raschke, *The Valuation of Losses Under Builder's Risk Policies*, 40 ABA Brief 50, 51 (Fall 2010) ("Most often the coverage is obtained by a contractor that has agreed to . . . build or repair a structure . . . ."). It hardly says that a builder's risk policy insuring an owner *automatically insures* the contractor as well.

### D.    Insurance Law Principles Confirm Our Interpretation of the Policy

Our reading of the Policy finds strong support in general principles of insurance law. An insured is not entitled to recover any time there is damage to the covered property. It can recover only "*for [its] actual monetary loss* by the occurrence of the disaster." *Appleman on Insurance Law & Practice Archive* § 1.10 (2d ed. 2024) (Appleman) (emphasis added);[2] *see also Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 232 (Colo. 1988) ("A fire insurance policy is generally viewed as a contract indemnifying the insured party for loss to his insurable interest and not as providing proceeds on the

---

[2] The Colorado Supreme Court regularly cites Appleman's treatises on insurance law with approval. *See, e.g.*, *Apodaca v. Allstate Ins. Co.*, 255 P.3d 1099, 1103 (Colo. 2011); *Bailey*, 255 P.3d at 1047; *Radil v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 233 P.3d 688, 693 (Colo. 2010); *Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 647 (Colo. 2005); *Chacon*, 788 P.2d at 750; *Baumgartner v. Burt*, 365 P.2d 681, 683 (Colo. 1961).

property itself." (internal quotation marks omitted)). As stated in Appleman: "Simply, you do not insure your home. You insure your interest in your home." Appleman, *supra*, at § 1.10. For example, if your roof is damaged during a storm, you might contact a contractor to repair it. If your contractor offers to repair the roof for *free*, you will not be able to recover under your homeowner's policy. You suffered no loss. *See id.*; *see also Spirit of Excellence, Ltd. v. Intercargo Ins. Co.,* 777 N.E.2d 660, 674 (Ill. App. Ct. 2002) (internal quotation marks omitted) (holding that the insured could not recover under its inland marine insurance contract because it "did not pay for repairs using its own funds" and therefore had not suffered "*actual monetary loss*").

Just so here. If the owner is the named insured but the cost of repair has indisputably been borne by the contractor, the owner cannot recover. The insured has suffered no actual loss. An insurer "has no liability" when the insured "has suffered *no* economic loss as a result of the occurrence of the event insured against." Robert E. Keeton, Alan I. Widiss, & James M. Fischer, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* 167 (2d ed. 2017) (Keeton).

This actual-loss requirement comports with "the core concept of *restitutio in integrum*, which is to say that the purpose of insurance is to repair or restore; a contract of insurance is not intended to secure a profit, except for the insurer . . . ." *Id.* at 112–13 (footnote omitted). "[O]pportunities for net gain to an insured through the receipt of insurance proceeds exceeding a loss should be regarded as inimical to the public interest." *Id.* at 113. Insurance should make the insured whole, not grant the insured a windfall. *See* Appleman, *supra*, at § 3.1 ("[I]nsurance should not

provide a party with the means of realizing a net profit when an insured event occurs"). If Curtis Park could recover more than its own actual loss, it would enjoy just the kind of windfall that is prohibited by the principle of *restitutio in integrum*.

This principle is founded on substantial policy concerns. To begin with, it limits gambling on insurance coverage. When an insured can recover under a policy for more than its loss, it is essentially wagering (by paying a premium on the policy) that someone else will suffer a loss for which the insured will be "reimbursed." Principles of insurance law forbid such a result:

> Foremost among the potential evils that were originally regarded as an undesirable consequence of insurance contracts which permitted a net gain by an insured was the prospect that such transactions would be used for gambling. The concern was that if an insured were allowed to derive a net gain from an insurance policy, it would encourage the use of insurance as a means of wagering.

Keeton, *supra*, at 114; *see* Douglas G. Houser and Thomas W. Rynard, *Insuring Real Property* § 1.03 (2024) ("Insurance contracts which provide for benefits beyond indemnification have generally been viewed as 'wagering' contracts. A wagering contract is against public policy and cannot be covered by insurance . . . . [If] there is no risk of financial loss by the insured[,] . . . the insured would receive a windfall because he would not have suffered any financial loss from the destruction or damage of the property.").

In addition, an insurance policy that pays an insured more than its loss can encourage careless or even intentional misconduct. All insurance policies to some extent create what is known as moral hazard—the risk that the prospect of insurance

Page 17

coverage incentivizes careless risk-taking or worse misbehavior. When an insured party is totally protected from injury resulting from the insured event, it might "have a tendency to act less carefully because someone else will bear the consequence of any resulting loss." Robert H. Jerry, II, *New Appleman on Insurance Law Library Edition* § 1.01(b) (2024) (New Appleman). But this risk is substantially magnified when the insured can actually profit from suffering an insured loss. *Cf.* Keeton, *supra*, at 116 ("Allowing persons who do not have insurable interests to purchase insurance affords the potential for inducing the intentional destruction of insured . . . property . . . .").

Curtis Park's interpretation of the Policy would create just such a moral hazard. This becomes clear when we consider how the Policy is intended to operate. The Policy provides no coverage for loss caused by defective construction. This provision protects Allied World from unnecessary losses because it incentivizes Curtis Park to (1) take care in the selection and oversight of the contractor and subcontractors and (2) encourage care by the contractor and subcontractors by entering into contracts that place the risk of loss from defective construction on them. But these incentives are reversed under Curtis Park's interpretation of the Policy. If the hard-cost award in district court is upheld, Curtis Park is better off than it would have been (1) if there had been no problem with the construction (in which case it would have paid the same amount to Milender White and received the same finished product but would not be getting the bonus of an award against Allied World) or (2) if there had been the same problem with the construction but it had established

that Milender White was at fault (in which case Milender White would have had to bear the cost of the repair, and Allied World would not have to make a payment under the Policy for hard costs). Thus, under Curtis Park's reading of the Policy, it could make an extra million dollars (or more) by overlooking (or even colluding to conceal) construction defects. The resulting moral hazard and skewing of the purposes of insurance are obvious.

### E.    Curtis Park Did Not Pay for the Loss

But, says Curtis Park, even if it cannot recover directly for Milender White's loss, it should still be covered by the Policy because it *has* actually paid for the hard costs of repair. It points to the Close-Out Agreement and says that its promises to Milender White were the mechanism of its payment. It acknowledges that it did not pay for the repairs when they were performed but points out that spending on credit is still paying. We have no quarrel with the proposition that paying with credit constitutes spending. After all, we say we spent money on a meal even though we paid with a credit card. *See West End Harbor Condo. Ass'n, Inc. v. Wright Nat'l Flood Ins. Co.*, 2022 WL 18936050, at *5 (N.D. Fla. July 18, 2022).

The problem with Curtis Park's reasoning, however, is that the Close-Out Agreement is not a payment on credit. Under that agreement, Curtis Park is freed of any obligation to pay Milender White *anything*. Its reliance on *West End* is misplaced. The court in that case said only that the insured might be able to recover if it had outstanding debts for the repair work performed. *Id.* at *5. The *West End* court denied summary judgment for the insurer because there was "conflicting evidence as

to whether all of the contractors . . . have been fully paid and/or are owed any additional money." *Id*. Here, in contrast, the Close-Out Agreement eliminates any obligation of Curtis Park to pay *anyone* for the hard costs of repair.

Perhaps some imaginative linguistic manipulation could equate the Close-Out Agreement to a payment on credit. But any such effort would fail in the face of fundamental principles of insurance law discussed above. Just look at the bottom line. If Curtis Park prevails on its claim for "reimbursement" of the hard costs, it would keep 37.8% of the recovery. That sum would be a profit for Curtis Park on its insurance policy (and the remainder of the "reimbursement" would benefit a party that is not a named insured). The Close-Out Agreement made Curtis Park more than whole. That Agreement guaranteed that Curtis Park would obtain the completed construction of S*Park at the price it had originally agreed to pay and then could make a tidy sum off this litigation. That is a no-no. "[I]t is not the purpose of insurance to provide the insured with opportunities for profit." New Appleman, *supra*, at § 1.05.

### F.    Reversal on Hard Costs and New Trial on All Other Issues

The above discussion demonstrates that Curtis Park is not entitled to recover on its claim for hard costs. The only remaining issue is what should be done about the judgment on Curtis Park's other claims. Curtis Park suggests that the rest of its judgment should stand. We disagree.

The district court erroneously instructed the jury that Curtis Park could recover on the Policy regardless of who actually paid for the hard costs of repairing the slab.

The impact of that error extends beyond the award of hard costs. At least two other issues have likely been affected.

First, Allied World raised the affirmative defense that Curtis Park forfeited any right to recovery on the Policy by willfully misrepresenting Milender White's losses as its own. This was an easy claim for the jury to reject in light of the court's erroneous jury instruction. Under that instruction the misrepresentation was inconsequential because Allied World would have to pay regardless of who actually shouldered the costs of repair. A properly instructed jury might well have reached a different conclusion. Thus, we must reverse for a new trial with proper instructions. *See Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002) ("[W]here a jury instruction is legally erroneous," a new trial is required if "the jury might have based its verdict on the erroneously given instruction." (internal quotation marks omitted)).

Second, Allied World also raised as an affirmative defense that the slab's deflection was caused by faulty construction and was therefore excluded under the Policy. The jury rejected that defense, presumably because it believed the testimony on behalf of Curtis Park that the construction was satisfactory. If, however, the jury had been fully informed about all the relevant parties' financial incentives, it may have weighed the evidence differently.

In addition, the district court's misconceptions about the governing law may have affected some of its evidentiary rulings, which could have had an impact on the verdict. Those rulings will need to be revisited on remand. And, of course, the errors

may well have affected the verdict on the bad-faith claim. Since the district court's erroneous ruling likely had cascading prejudicial effects throughout trial, a full retrial on Curtis Park's remaining claims is required.

### III.    CONCLUSION

We **REVERSE** the judgment with respect to hard costs and **REMAND** for entry of judgment in favor of Allied World on that claim. With respect to the remainder of the judgment below, we **VACATE** and **REMAND** for a new trial consistent with this opinion.